CARL E. GROSS *et al.*, Individually and for Others Similarly Situated, Plaintiffs-Appellants, *v.* THE UNIVERSITY OF CHICAGO, Defendant-Appellee.

(No. 57956; ▮▮▮▮▮▮▮▮▮▮

First District (1st Division)—August 20, 1973.

Bernard M. Mamet, of Chicago, (Gary M. Baxter, of counsel,) for appellants.

Seyfarth, Shaw, Fairweather & Geraldson, and Mayer, Brown & Platt, both of Chicago, (Robert H. Joyce, Allan Gunn, and Robert E. Mann, of counsel,) for appellee.

Mr. JUSTICE EGAN delivered the opinion of the court:

The plaintiffs, purporting to represent 3500 current and former employees of Argonne National Laboratory (hereafter, Argonne or Laboratory), filed this complaint as a class action against the University of Chicago (hereafter, the University). The complaint alleged, in substance, that the University operates the Laboratory for the benefit of the Atomic Energy Commission (hereafter, the Commission); that the Laboratory instituted a Group Retirement Plan for the benefit of its employees on January 1, 1948, under which the Laboratory was to contribute amounts in designated ratios to amounts contributed by the employees; and that the Laboratory breached its contract and its fiduciary relationship with the employees by improperly converting to its own use sums which be-

longed to the amount accumulated by the employees in the Plan. The complaint prayed for an accounting of the amounts converted; and that the defendant be mandatorily enjoined to apply certain amounts for the benefit of the employees.

In the answer denying that it breached any obligations, or that a fiduciary relationship existed, the defendant affirmatively defended on the grounds of: the Statute of Limitations; Laches; the Statute of Frauds; the failure of the plaintiffs to exhaust administrative remedies; and that the complaint failed to state a claim supporting a class action. After a trial, the judge entered judgment for the defendant. The determinative issues are whether a fiduciary relationship existed between the parties and what comprised the terms of the contract between them. In view of our decision on these issues, it is unnecessary for us to pass on the affirmative defenses advanced.

The property comprising Argonne National Laboratory is owned by the Atomic Energy Commission, which has a contract with the University of Chicago. Under the terms of that contract the University operates the Laboratory. The Atomic Energy Commission maintains a bank account at the First National Bank of Chicago, which it uses to pay the expenses and costs in the operation of the Laboratory. This is a revolving account, and Argonne National Laboratory draws checks on it for the purposes of paying its operating costs. The funds are periodically replenished by the Commission. The University operates the Laboratory for a fee, but it is not reimbursed for all expenses nor does it advance any funds.

In 1948, a mandatory plan was instituted for the employees of the Laboratory which would provide for their retirement. Under the contract that went into effect with Prudential Insurance Company, an amount equal to 10% of each employee's current annual salary was to be used to purchase from the insurer an annuity pension at age 65. The employee was required to contribute 2½% of his gross wages up to a certain breakpoint, which was a specific wage level, and 5% of his gross wages in excess of that breakpoint for the purchase of the annuity. The Laboratory was to contribute an amount equal to 7½% of such employees' monthly wages up to the breakpoint and 5% of his monthly wages in excess of the breakpoint. The Plan contained a 10-year vesting requirement, and an employee would receive his contribution plus interest if he terminated his employment prior to the 10-year vesting period.

A dividend under an annuity or any other type of insurance policy is different from one in a commercial enterprise. Both actuaries who testified, Harry M. Sarason for the plaintiffs and Willard Burger for the defendant, explained that it is impossible to determine what an annuity will actually cost since it involves a projection many years into the future.

The premium or cost is based, in part, on assumptions made by the actuary, which, for the safety of the company, reflect adverse conditions. It is also based on the anticipated life span of the individual, upon the actual investment earnings and the accumulated reserve. Experience, so they testified, does not always follow what the actuary assumed. When the cost turns out to be less than the amount anticipated and charged, there is an excess of accumulation of funds; this is divisible surplus. Under participating contracts such as the one in question, this divisible surplus can be declared as a dividend. In short, it is a return of that part of the purchase price of the annuity which the insurance company decides is not necessary to meet its obligations.

Withdrawal credits arise when an employee terminates participation in the Plan before acquiring vested rights under a paid-up annuity. The annuity is then canceled and the participant gets back his contribution plus some interest. The balance, essentially what the employer contributed, less administrative charges, goes back as a withdrawal credit to the employer. This lawsuit centers on the question of which of the parties is entitled to the divisible surplus and the withdrawal credits.

John McKinley, the business manager of the Laboratory in the fall of 1946 until February 29, 1972, was, from the inception of the Plan, a member of a group, consisting of the business manager of the University, the controller at the University, and Doctor Dahn, which participated in the retirement plan negotiations with Prudential. McKinley testified that initially it was the intention of the Laboratory that the dividends and withdrawal credits would be applied to the Plan to purchase additional benefits. Prior to January 1, 1948, the date the Plan went into effect, it was submitted to the Commission for approval. The Commission did approve the considerations in the Plan with respect to the employees and employers but at that time did not approve the use of dividends nor the withdrawal credits for the benefit of the Laboratory. However, the issue of applications of dividends and withdrawal credits was not dropped by the Laboratory. Further efforts were made, but unsuccessfully, to seek the application of dividends and withdrawal credits for the employees' benefits with Commission approval.

The final contract between the Laboratory and Prudential was received by the Laboratory in the early part of 1949. The pertinent parts of that contract are as follows:,

> "Provision V.   CANCELATION OF NORMAL RETIREMENT ANNUITY:
>
> \*   \*   \*
>
> 2.   Reapplication of Employer's Contributions:
>      If Normal Retirement Annuity purchased for a Participant by

Employer's Contributions is canceled for any reason other than the death of the Participant, and if evidence satisfactory to the Prudential that the Participant was in good health on the date of cancelation is submitted to the Prudential within six months thereafter, then, as of the Contract Anniversary following cancelation, *the following amounts of such Employer's Contributions previously applied shall be available for reapplication as Employer's Contributions then or next thereafter becoming due under this Contract:*

\* \* \*

Provision XI. DIVISIBLE SURPLUS:

The portion, if any, of the divisible surplus accruing upon this Contract at each Contract Anniversary shall be determined annually by the Board of Directors of the Prudential and shall be credited to this Contract as a dividend on such Contract Anniversary. *During the Active Term, any such dividend shall be applied toward the payment of Employer's Contributions then. or next thereafter becoming due.* During the Paid-Up. Term, any such dividend shall be paid to the Employer in cash, except as otherwise provided in Provision A." (Emphasis added.)

On cross-examination, McKinley stated that originally there was no formal objection by the Commission to the dividends or credits being applied to the benefits paid to the employees and it was not until the late summer of 1948 that the Commission formally rejected such application of dividends and credits. Some of the plaintiffs admitted that their booklets provided that benefits would not be increased through use of dividends and credits except upon approval of the Atomic Energy Commission.

Before the Plan was adopted, on December 29, 1947, Argonne National Laboratory issued a special edition of the Argonne Bulletin stating that the Laboratory had adopted two new employee benefit plans and that details of the two plans would be explained in pamphlets which would be distributed to each member of the Laboratory before January 1, 1948. The bulletin was silent as to the disposition of dividends and credits.

A pamphlet entitled "The Group Retirement Plan for Employees of Argonne National Laboratories" was then distributed to the employees. It provided:

"Any dividends or credits to the Laboratory arising under the Group Annuity Contract *will be used to purchase additional benefits for members.*" (Emphasis added.)

Further, on the last page of the booklet, which explains the method of computing estimated monthly income at age 65, after examples showing the computation, there is an asterisk after the total amount figured in three examples. This asterisk is explained at the bottom of the page thus:

> "Any dividends or credits to the Laboratory arising under the Group Annuity Contract will increase the retirement benefits."

The purpose of the booklet, as stated in its cover letter signed by the director, was to explain the retirement plan. It further provided in the booklet:

> "The particulars of the Plan, as outlined in this booklet, and in the certificates issued to participating employees, necessarily cannot reproduce the exact language or all the provisions of the Group Annuity Contract, *which will be controlling with respect to all benefits payable under the Plan.*" (Emphasis added.)

McKinley further testified that in early January, 1949, a second booklet was printed because they had run out of the first one. Three other booklets were also subsequently printed for the same reason. The last is dated August, 1952. The four booklets are all similar in form to the original one. They contained the exact wording of the original booklet except for two changes that are pertinent here. On page 6 of the four subsequent booklets the provision relating to dividends and credits was changed to read:

> "Any dividends or credits to the Laboratory arising under the Group Annuity Contract *will be used by the Laboratory to help pay the cost of the benefits which members will be eligible to receive.*" (Emphasis added.)

Further, the footnote on the bottom of page 10 following the examples on how to compute estimated monthly income at age 65 was changed to read:

> "Any dividends or credits to the Laboratory arising under the Group Annuity Contract will increase the retirement benefits upon approval by the Atomic Energy Commission."

These four booklets are identical in wording and format and, like the original booklet, contain the provision that the Group Annuity Contract would be controlling with respect to all benefits payable under the Plan.

Donald Drumm, an employment interviewer, testified that the retirement plan booklet took on different formats, i.e., mimeographed booklets, due to union negotiations, through which the breakpoint for the contribution was changed in several unions and a variety of breakpoints resulted. When the breakpoint was changed, one of the original booklets was mimeographed to accommodate the various breakpoints which then corresponded to the union to which the booklet was directed. Everytime a

breakpoint was changed, there was a run-off of a booklet reflecting these changes. The printed booklets, however, were continually used during this period because there was an overlap with some groups remaining at the old breakpoint. It is unclear from the record exactly how many of these mimeographed booklets were distributed, but three of them were introduced into evidence, one dated January, 1960, one August, 1962, and the last one June, 1963. They, like all the other booklets introduced into evidence, contain the same paragraph which stated that the Group Annuity Contract would be controlling with respect to all benefits payable under the Plan. They also contain the same statement as to dividends and credits that is found in the four subsequent printings of the original booklet:

> "Any dividends or credits to the Laboratory arising under the Group Annuity Contract will be used by the Laboratory to help pay the cost of the benefits which members will be eligible to receive."

Two of them, dated August, 1962 and June, 1963, contain no statement about approval by the Commission for the use of the dividends and credits. But the third one, dated January, 1960, contains the statement:

> "Any dividends or credits to the Laboratory arising under the Group Annuity Contract will increase the retirement benefits upon approval by the Atomic Energy Commission."

Drumm further testified that in 1963, the first major revision of the booklet occurred. This was due to the Variable Annuity Plan that was adopted by Argonne at that time. With the adoption of the Variable Annuity Plan, a new booklet was put out. An opening letter from J. H. McKinley, described the new Plan, and stated: "A full description of the revised plan is contained in this booklet, which replaces any previous information furnished you on this subject." This booklet, unlike the others distributed, contained no specific reference to the application of dividends and credits. However, on page 21, paragraph 18, entitled: "Group Annuity Contract Controlling" is the following:

> "This booklet, and the certificate issued to you, cannot reproduce the exact language or all the provisions of the Group Annuity Contract, which shall control all benefits under the Plan."

Each employee received a certificate of participation in the Plan with attached explanatory material which was issued by Prudential Insurance Company. That material stated that the employer would contribute an amount equal to a sum of three times the amount contributed by the participant which was not in excess of the breakpoint and an amount which was equal to the monthly contributions of the participant for that portion of the salary in excess of the breakpoint. The certificate made no

reference to the disposition of dividends and credits. On the face of the certificate it stated:

> "All rights, benefits and privileges described herein are governed by and are subject in every respect to the Group Annuity Contract, which alone constitutes the agreement under which payments are made."

Handbooks were also issued by Argonne to their various employees. These handbooks summarily referred to the plans and state that for complete details in regards to the Plan they should refer to a booklet of the series entitled "Retirement" or that an employee contemplating retirement or requesting additional information concerning the retirement plan should communicate with the employee service section of the personnel department. Finally, the annual statement of employees' benefits which was sent to each employee to show his participation in the Plan also made no reference to dividend and credit application. William F. Thompson, the director of employee services, testified it was impossible to tell whether Argonne was getting the credits and dividends back by looking at the annual benefit statement.

On November 7, 1963, the contract was amended in its entirety to be effective as of January 1, 1964. This was done to provide for the variable annuity that went into effect at that time. The pertinent parts of that contract are as follows:

> "Provision VII.   CANCELATION OF NORMAL ANNUITY:
>
> * * *
>
> 2. *Reapplication of Employer's Contributions:*
>
> If Normal Annuity purchased for a Participant by Employer's Contributions is canceled for any reason other than the death of the Participant or conversion in accordance with Provision VI, and if evidence satisfactory to the Prudential that the Participant was in good health on the date of cancelation is submitted to the Prudential within six months thereafter, then as of the Contrary Anniversary following cancelation *the following amount of Employer's Contributions with interest thereon shall be available for reapplication as Employer's Contributions* then or next thereafter becoming due under this contract: (i) with respect to Normal Annuity canceled before January 1, 1965, the total amount, determined from that part of Schedule B applicable to Normal Fixed Dollar Annuity purchased on January 1, 1964, required to purchase the amount of Normal Annuity in effect for such Participant immediately prior to the date of cancelation, reduced by the aggregate of the Participant's Contributions with interest thereon to the date of cancelation, and

(ii) with respect to Normal Annuity canceled on or after January 1, 1965, the amount determined from Schedule B-1.

\* \* \*

Provision XIII. DIVISIBLE SURPLUS:

The portion, if any, of the divisible surplus accruing upon this Contract at each Contract Anniversary shall be determined annually by the Board of Directors of the Prudential and shall be credited to this Contract as a dividend on such Contract Anniversary. *During the Active Term, any such dividend shall be applied toward the payment of Employer's Contributions then or next thereafter becoming due.* During the Paid-Up Term, any such dividend shall be paid to the Employer in cash, except as otherwise provided in Provision A." (Emphasis added.)

In 1971, while the suit was pending, the Group Annuity Contract was amended to provide that dividends and credits would be used to purchase additional benefits for the employees under the contract. This provision was made retroactive in that it applied to any dividends declared on or after January 1, 1969.

During the meetings held in 1969, the employees were told that they did in fact receive the total 10% that went into their account; that what dividends or credits that were received were used to reduce the net cost to the Laboratory; and that this had no effect on what the employee received under the contract. However, the employees were never told that, if an employee were to withdraw from the Plan before it became vested, the 7½% credit would go back to Argonne to reduce its net cost. Similarly, they were never told that the dividends would be used to reduce Argonne's 7½% until the 1969 meeting.

Mr. Sarason compared the cost regarding the Argonne Plan with an individual plan which a person who came off the street into a Prudential agency could buy. He found that at age 45 the Argonne Plan, in comparison to the individual rates put out by Prudential, should have bought 56.14% more in benefits. On cross-examination Sarason testified that the figures he used in determining the individual rate were those of a non-participating plan where there are no dividends, whereas the Argonne Plan is a participating one.

Various employees testified to representations made to them about the Plan. A summary of the testimony is that before being hired at Argonne they had personal interviews at which time the Plan was described to them. About a week or so after their original personal interviews, they attended orientation meetings where the subject matter of the Plan was also presented to them. Finally, at a meeting held in 1963 to explain the

variable annuity which was added to the Plan, details were also described. In substance, the oral representations by various representatives of the personnel department were that, if the employee quit before ten years, he would receive the amount that he had contributed plus interest and the amount that the employer, Argonne, had put in would stay in the "pot." Some time in 1969, rumors began spreading that Argonne was getting rebates on the insurance contract. A meeting was then held, and for the first time, according to the testimony of the employees, they learned the manner in which dividends and credits were being applied under the contract. Further, the employees testified that this was the first time that they learned that this Plan was subject to any approval by the Atomic Energy Commission.

The testimony of the employees that they were unaware that Argonne was receiving any rebates under the insurance contract with Prudential is corroborated by the minutes of the seventh meeting of the negotiating committee of the Laboratory with the Argonne's guard union. This memorandum, dated October 27, 1960, stated: "The subject of changing the retirement contribution schedule was brought up by Mr. Wilkinson (Union Representative). Mr. Wesley (Laboratory Representative) went to the blackboard to illustrate what happens to pension funds. His illustration emphasized that the Laboratory receives none of its premium in rebates."

Finally, the employee's handbook distributed by the Laboratory states that important editions or revisions would be announced by letters or other official Laboratory media to the employees. It was stipulated by the parties that the Laboratory had an inter-office mail system by which the Laboratory could expeditiously inform the employees of anything it wished. However, no distributions were made by Argonne to any of its employees informing them that Argonne was using the dividends and credits to reduce its premiums with Prudential.

January 1, 1948, was the effective date for employer and employee contributions, but the contract between Prudential and the Laboratory was completed in March of 1949. The Laboratory had begun to solicit employee participation several weeks before January 1 and continued the solicitation during the first part of 1948. The original booklet also provided that the Laboratory reserved the right to amend or discontinue the Plan but that no change could affect the retirement income purchased before the date of change or discontinuance. Thus, while the original booklet recited that dividends or credits would be "used to purchase additional benefits for members" and would "increase the retirement benefits," distribution of that booklet was discontinued in the summer of 1948, and each booklet subsequently issued, beginning in 1949 up to 1963, expressly

provided that all dividends or credits would be used by the Laboratory to help pay the costs of the benefits. At one point in their brief, the plaintiffs suggest that the language of the second booklet is ambiguous, but at another they say that the contract is not ambiguous. Even accepting the basic premise of the plaintiffs that the original booklet represented the original contract between the parties, it seems inescapable that the Laboratory exercised its power and changed it in the early part of 1949 when the insurance agreement was completed with Prudential. It surely cannot be argued that the rights of the original participants as well as all subsequent ones were locked in by the original booklet. (*Hughes v. Encyclopaedia Britannica, Inc.*, 1 Ill.App.2d 514, 519, 117 N.E.2d 880.) The plaintiffs certainly recognized this as they negotiated better terms including a change in the breakpoint.

The plaintiffs contend that their contract is not the agreement between Prudential and the Laboratory "but consists of what was promulgated in writing and explained verbally to the employees." But what was promulgated in writing varied from time to time, and not all employees were present when Wesley made his statements, nor were all employees informed by management personnel that the dividends and credits would go "into the pot." (Although apparently, as the plaintiffs' brief indicates, hundreds of employees were told the same thing.) A number of questions then arise: Did the employees present when Wesley made his representation have a different contract than those who were not? Or did those who received the first booklet have a different contract than those who received the later ones? Or did the employees who received assurances from management personnel have a different contract than those who did not receive them?

The plaintiff relies primarily on language appearing in *Hughes v. Encyclopaedia Britannica, Inc.*, 1 Ill.App.2d 514, 117 N.E.2d 880. In that case, the employer put into effect a non-contributory retirement income plan by which it agreed to purchase insurance for the employees each year but failed to make two payments. Subsequently, it made promises to make the payments, and in reliance thereon the employees continued to work. The class action was based on breach of contract and promissory estoppel. (Estoppel is not relied upon in the present case.) The defendant contended that the only document to which the plaintiffs could look to determine their rights was the group annuity contract. The Appellate Court held that the non-contributory pension plan did not give rise to an enforceable contract since the agreement between employer and employee expressly provided that the defendant reserved the right to amend or discontinue the plan, that payments were voluntary on the part of the employer, and that no contractual relationship was intended or created

between the parties. By way of dictum, the court said that the contract between the employer and insurance company was not relevant to any issue in the case. Indeed it was not; because there was no contradiction between the terms of the plan and the insurance contract. But we believe, as the defendant contends, that the contractual rights of the parties necessarily depend on the agreement between the Laboratory and Prudential which provided from its inception that the dividends or credits would be used by the Laboratory. More in point are the cases of *Voigt v. South Side Laundry & Dry Cleaners, Inc.*, 24 Wis.2d 114, 128 N.W.2d 411, and *Fields v. Western Equipment Co. of Eugene*, 255 Or. 615, 469 P.2d 779. In *Voigt*, the employer distributed a printed outline of the retirement income plan to its employees. The concluding paragraph provided:

> "Of course this is only a brief outline of the Retirement Income Plan. The Plan will be governed entirely by the terms of the Group Annuity Contract between the Company and the Prudential."

The Supreme Court of Wisconsin held that under a reasonable interpretation of the provisions that appeared in the outline the plaintiff was entitled to recovery. However, the court noted that the group annuity contract between the employer and Prudential was not offered into evidence at the trial and held: If the contract provisions differed from the outline, the contract would control; since the cause of action was based on a written contract and not estoppel, any verbal explanations of the plan made by the defendant's officers were immaterial; and since the written contract was not before the court, the case was remanded for the purpose of having the controlling annuity contract produced and admitted into evidence. In *Fields*, the plan was represented to the employees by an announcement which concluded with the statement:

> "The purpose of this announcement is to highlight the various benefits and provisions of the plan of interest to you. A complete copy of the profit sharing plan and trust agreement will be maintained in the company's office for your inspection."

The Supreme Court of Oregon held that this concluding paragraph in the announcement gave the plaintiffs adequate warning that the announcement was not the company's offer but was an invitation to look at the plan itself; and, if they were interested in participating in it, they were placed on notice that the formal written plan was the controlling instrument. We note that one of the cases cited by the plaintiffs, *Miller v. Dictaphone Corp.* (D.C.Ore. 1971), 334 F.Supp. 840, held for the employee and specifically distinguished the *Fields* case because, in the case before it, the letter and enclosed summary of the plan contained no warning or qualifying language. See also 50 A.L.R.3d 1270.

We agree with the plaintiffs' statement that the contract is not

ambiguous. (Although we disagree with their contention as to what constitutes the contract.) In *Bos v. United States Rubber Co.*, 100 Cal.App.2d 565, 224 P.2d 386, 389, it was held that oral representations made to an employee by representatives of the employer were not admissible to alter the terms of a written pension agreement. (See also *Vocke v. Third National Bank & Trust Co.*, 55 Ohio Op.2d 258, 267 N.E.2d 606.) We think the case before us points up the wisdom of the holdings of *Voigt, Fields* and *Bos*. A large number of people performing ministerial duties for the defendant had been in contact with the plaintiffs for 20 years. A vast amount of written material was disseminated including handbooks, certificates, bulletins, printed booklets, mimeographed booklets, and annual statements, many of which varied in some details from others; information was given by employment interviewers and by designated spokesmen at meetings. To adopt the position of the plaintiffs would leave the employer to the mercy of any number of those agents acting independently, and he would be bound by their representations even in the face of an express agreement. For these reasons we conclude that the Group Annuity Contract that is controlling is an express written agreement, and it may not be modified or altered by representations, oral or written, by representatives of Argonne.

The plaintiffs further argue that the contract required the Laboratory to contribute three dollars for every dollar that the employees put in, and that the Laboratory did not do so. If the plaintiffs' position is correct, the provision of the contract relating to dividends and credits is redundant. Meaning and effect should be given, if possible, to every part of a contract including all its terms and provisions. No part of a contract should be rejected as meaningless or surplusage unless absolutely necessary. (*Home and Automobile Insurance Co. v. Scharli*, 10 Ill.App.3d 133, 293, N.E.2d 914, 918.) We conclude that the provisions of the contract relating to dividends and credits were inserted deliberately and for a purpose, and we may not disregard them.

■■ The other theory of recovery advanced by the plaintiffs is that the defendant breached its fiduciary obligation. First we must determine whether a fiduciary relationship existed. The relationship may arise by operation of law, e.g., attorney and client, guardian and ward; but, absent the existence of the relationship by law, it must be proved by the party asserting it (*Apple v. Apple*, 407 Ill. 464, 95 N.E.2d 334); and it "must be shown by proof so clear and convincing, so strong, unequivocal and unmistaking that it leads to only one conclusion." (*In re Estate of Nelson*, 132 Ill.App.2d 544, 270 N.E.2d 65, 70.) The proof must show confidence reposed by one side and domination and influence exercised by the other. *LeBlanc v. Atkins*, 387 Ill. 360, 56 N.E.2d 770.

The plaintiffs maintain that, because of the defendant's promises regarding the Plan, the plaintiffs reposed not only trust and confidence but their earnings as well, and the defendant obtained domination and influence over them; and because the defendant had "exclusive knowledge of the intricacies of the Group Annuity Contract it was clearly the superior party."

First, the contract was available to the plaintiffs, and we cannot impute exclusive knowledge to the defendant. Second, there is no proof of "domination and influence" by the defendant other than the fact of the employer-employee relation, and that is not enough. (*Renshaw v. Tracy Loan & Trust Co.*, 87 Utah 364, 49 P.2d 403; *Vargas v. Esquire* (7th Cir.), 166 F.2d 651, 653.) In *Hurd v. Illinois Bell Telephone Co.* (7th Cir.), 136 F.Supp. 125, *aff'd*, 234 F.2d 942, to the argument that the employer violated his fiduciary duty to the employee pensioner, the court said the principles of trust law were not applicable and that the duties of the employer to all its employees were contractual.

■■ We agree with the trial court's statement that the Laboratory failed to explain adequately to the people precisely what was transpiring, but no wilful misrepresentation or concealment has even been charged. At the time of the issuance of the first booklet, the negotiations involving the Laboratory and employees, the Laboratory and the insurance company, and the question of Commission approval were in a state of flux. Charles Barnes testified that at a meeting in 1968 Mr. Dickerson, representing the Laboratory, was asked why management didn't send out a copy of the Prudential contract to each employee. Dickerson answered that it would cost too much and the average employee would not understand it. But there is no evidence to show that the Prudential contract was not available to anyone who wished to see it from 1949 on. (*Cf. Dictaphone Corporation v. Clemons*, 488 P.2d 226.) And every booklet and certificate advised the employee that the terms of the insurance contract were controlling.

For these reasons we conclude that the trial court's determination that the evidence failed to show a breach of a fiduciary obligation, which is implicit in the judgment, is not against the manifest weight of the evidence.

The judgment of the circuit court is affirmed.

Judgment affirmed.

BURKE, P. J., and GOLDBERG, J., concur.