FRED R. SISS, Plaintiff-Appellant, *v.* UNITED STATES STEEL CORPORATION *et al.,* Defendants-Appellees.

(No. 61549;

First District (3rd Division)—November 6, 1975.

*Rehearing denied December 11, 1975.*

Raymond P. Concannon, of Miller and Concannon, of Chicago, for appellant.

Benjamin F. Cornelius, of Chicago, for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

This case involves a dispute between a retired employee and his employer over his pension. The trial court ruled against the employee and he has appealed.

United States Steel Corporation maintains a pension program for its 178,000 employees to which they make no contribution. The program is administered by the U.S. Steel and Carnegie Pension Fund, a Pennsylvania Corporation, and the rules which govern the program are to be construed according to the laws of Pennsylvania. The rules provide for several types of retirement plans for employees who have at least 15 years of service. One of these is for employees under 65 years of age who terminate their employment after at least 30 years of continuous service. A written application must be made to the company and the pension commences the first full calendar month following the month in which the retirement occurs.

Fred Siss started working at the South Works (Chicago) of United States Steel in 1930 when he was 21 years old. He was laid off in 1932, but was rehired in 1935 and worked steadily until 1971. He became eligible for the "thirty year" pension in 1966, but kept on working. In the summer of 1970 he decided to take his pension and went to the company's personnel office to fill out the necessary application. He was a good employee and the head of the department tried to dissuade him, suggesting that he think it over. Upon reflection, Siss changed his mind and stayed on the job. He testified, however, that he definitely decided to retire on his 62nd birthday, December 16, 1971.

In December 1970 Siss received a head injury while at work; despite this he continued working until July 1, 1971. In June 1971, he informed

his foreman and others, including the district superintendent, that he intended to take his pension on his 62nd birthday. After he stopped working in July 1971, he called in sick four or five times a month. He told his foreman that he might come back to work if his head pains improved and if his doctor said there was no danger. He also told his foreman that in no event would he return to his job after December 16, 1971. Sometime in November he stopped calling in sick, but the company continued to pay him his regular salary and did so until March 5, 1972, when his 26 weeks of sick-leave came to an end and two paid vacations of four weeks each—one for 1971 and one for 1972—expired.

Although Siss' intention to retire on December 16, 1971, is evidenced by his conversations with his immediate supervisors and by the application he made in September to the Federal government to have his social security benefits begin on that date, he did nothing in December 1971 to effectuate his intention to retire and take his pension. His plan was not to file his application until he had received the maximum benefit from his fully paid sick-leave and vacation periods. He was, however, diverted from his plan.

Siss knew that his sick-leave and vacation perquisites would terminate. Sometime in February 1972, he went to his union headquarters and asked for help in applying for his pension. He also asked about his rights under workmen's compensation law for the injury he sustained in December 1970. The union referred him to a lawyer and advised him not to apply for his pension until his workmen's compensation claim had been processed. He followed this advice.

Although his sick pay and paid-up vacations expired on March 5, 1972, the company still considered him as an employee absent because of illness. Because of this he accumulated service credit which increased the size of his prospective pension. In February 1973, after he had been away from his job for 19 months, the company notified him that it could no longer pay for his insurance. Siss became worried, talked to his lawyer and, on April 4, 1973, went to the company's personnel office and applied for his pension. He asked the administrator to start the pension from the date his sick pay and vacation benefits had expired, but was told that the pension rules prohibited the retroactive award of pensions and that his would start the following month. The first of his monthly pension payments was mailed to him in May 1973, and he has received them ever since.

Siss contends that under the *United States Steel 1972 Noncontributory Pension Rules* he was entitled to a pension starting March 5, 1972. In

the alternative he contends that if there is an ambiguity in the rules, the ambiguity, under Pennsylvania law, must be resolved in his favor.

The rule most pertinent to his contention is No. 1.1(i) which states that retirement occurs:

"(1) in the case of a participant who applies for pension prior to a break in continuous service, on the date he specifies as the date he wishes to retire, which shall be a date on or after the latest of
(i) the date of his request for retirement,
(ii) the date of his attainment of eligibility for a pension under these Pension Rules, or
(iii) the last day for which he earned wages from an Employing Company,
but not later than the last day of his continuous service;
(2) in the case of a participant who applies for a pension after a break in continuous service, on the last day of continuous service, provided that on such last day he was eligible for an immediate or deferred pension under these Pension Rules."

Continuous service is calculated from an employee's last hiring date and continues while he is on sick-leave and vacation. It is broken, generally, by his quitting, by his being discharged (unless he is re-employed within six months), or by the termination of his employment due to a permanent shutdown of a plant, payment of a severance allowance, or absence (other than absence due to a compensable disability or leave of absence) which continues for more than two years. Rule 5.1(b), (c).

Siss does not contend that his conversations with his foreman and superintendent were notice to U.S. Steel that he intended to retire. But he does argue that his retirement occurred on March 5, 1972, which date, according to Rule 1.1(i)(1)(i) was "the date of his request for retirement." He argues that this date complied with Rule 1.1(i)(1) in that it was the latest of the three dates specified in that rule, since (i), the date of his request for retirement was March 5, 1972; (ii), the date he attained eligibility for a pension was August 1, 1966, and (iii), the last date he earned wages from his employer was March 5, 1972.

We reject this reasoning. The date he wished to be retired was March 5, 1972, but the date he requested retirement was April 4, 1973. Rule 1.1(i)(1) must be read in conjunction with all the pension rules including Rule 3.13. No one who is eligible for a pension can receive it unless he has filled out an application as required by this rule:

"(a) Each application for a pension shall be in writing on a form provided by the * * * Corporation. * * *

(b) [A] participant may make application for pension at any time prior or subsequent to his retirement."

April 4, 1973, was the date Siss made his written application and is the latest of the dates specified in the three subdivisions of Rule 1.1(i)(1). It is this date which controls the pension of an employee "who applies for pension prior to a break in continuous service." When Siss applied for his pension on April 4, 1973, he was still an employee on sick-leave. This means that his last day of continuous service under Rule 5.1 could occur no earlier than April 4, 1973, because an employee cannot be retired and employed at the same time.

In avoidance of Rule 1.1(i)(1), Siss also argues that he applied for his pension after a break in continuous service and that this called Rule 1.1(i)(2) into play. Underlying this theory is the presumption that on March 5, 1972, he quit working for U.S. Steel. However, he never told anyone he was quitting on March 5th, nor did he take any action on that day to sever his relationship with his employer. Moreover, because of the uninterrupted relationship he profited by accumulating further service toward his pension (so that he is now receiving a larger monthly pension than he would have were it deemed that he retired on March 5, 1972).

The unfortunate fact is that Siss could have received the first installment of his pension in April 1972 if he had requested it in March of that year. But he wanted compensation for his injury as well as his pension and he followed the union's advice to secure the compensation before requesting the pension.

■■ We find no ambiguity in the rules and no unreasonableness in the company's interpretation of them. Under Pennsylvania law the decisions of the pension administrators are final and conclusive if they are reasonable and made in good faith. (*Garner v. Girard Trust Bank* (1971), 442 Pa. 166, 275 A.2d 359.) No matter how sympathetic a court may be to a pensioner's plight, it does not have authority to amend a pension plan in accordance with its own ideas of fairness. (*Reilly v. Walker Brothers* (1967), 425 Pa. 1, 229 A.2d 457.) A court has no power under the guise of interpretation to stretch the meaning of words so as to make pension rules conform to its own motion of equity, or to create pension rights by ignoring provisions which prevent such rights from accruing. A court has the power to liberally construe pension agreements in favor of employees and to resolve ambiguities in their interest, and especially so when considering policies adopted by pension administrators under discretionary administrative powers delegated to them, but it does not when there is no real ambiguity or when the administrators have only

one option—to follow the procedure set out in the pension plan and rules. *Garner v. Girard Trust Bank.*

The trial court correctly found that retroactive pension benefits were unavailable under the rules and the facts, and its judgment is affirmed.

Affirmed.

McGLOON, P. J., and MEJDA, J., concur.