William A. LEHNER

v.

CRANE CO.

Civ. A. No. 76–2940.

United States District Court, E. D. Pennsylvania.

March 28, 1978.

Frank J. Eustace, Philadelphia, Pa., for plaintiff.

William T. Coleman III, Philadelphia, Pa., for defendant.

## ADJUDICATION

DITTER, District Judge.

In this action, plaintiff seeks a declaratory judgment that he is entitled to increased pension benefits under a plan which became effective after his last day of work but prior to the expiration of his accrued vacation time. On the basis of the entire record, I conclude the failure of plaintiff's employer to disclose to him that changes in its retirement plan were imminent is of no moment; plaintiff's employment was not extended beyond the effective date of his resignation by the receipt of accrued vacation pay; and plaintiff's eligibility for benefits is to be determined by the plan in effect when his employment ended and not by the plan which became effective thereafter. Accordingly, judgment must be entered in favor of defendant.

## 1. The Factual Background.

For all practical purposes, the facts of this matter are not in dispute.[1] William A. Lehner, plaintiff, was first employed by defendant, Crane Co., on June 8, 1942. Crane's main office is in New York and it has 16 plants nationwide. In 1974, plaintiff became dissatisfied with his prospects for advancement with Crane. He obtained another job which was to begin April 1, 1974. On or about March 1, 1974, Lehner orally notified his immediate supervisors at Crane that he had accepted a new position and that he intended to terminate his employment at Crane as of March 15. At the urging of these supervisors, he agreed to stay on until March 29, 1974. Written notice of his intention to terminate was not given.

Sometime prior to March 29, plaintiff completed two forms, a "Termination of Employment" form and a "Change of Employee Status" form. Both stated that plaintiff's last day of work would be March 29, 1974. There was also a notation that plaintiff would receive "vacation pay for $9/12$

of 4 weeks."[2] On March 29, plaintiff received two checks, one for the pay period March 16 through March 29, and the second for the vacation time. Plaintiff was normally paid semi-monthly, on the fifteenth day and last working day of the month, and certain authorized deductions were taken out of each check for voluntary fringe benefits.[3] Lehner was removed from Crane's payroll as of March 29, 1974.

On several occasions prior to 1974, John Hukill, Crane's manager of employee benefits, had urged management to consider increases[4] in the pension program but without success. However, on March 15, 1974, he was instructed to prepare a plan which would substantially increase pension payments. He did so and sent it to Crane's president on March 20, 1974. The proposal was reviewed by Crane executives, submitted to its board of directors, and approved during a board meeting at the company's main offices in New York on March 25. Immediately after the plan was adopted, Hukill drafted a letter for the president's signature to announce the increases.

1. Plaintiff originally brought this action in the Montgomery County Court of Common Pleas. Defendant Crane Co. ("Crane") removed the matter to this court under 28 U.S.C. § 1441 on the basis of diversity of citizenship. Plaintiff then moved to remand, asserting that the amount in controversy is less than $10,000. This motion was denied.

Following discovery, Crane moved to dismiss for lack of subject matter jurisdiction and for summary judgment; plaintiff cross-moved for summary judgment. Prior to oral argument on the motions, however, plaintiff's counsel represented that 1) most of the case would involve the offering of depositions, exhibits, and affidavits; 2) plaintiff would appear at argument in order to be questioned by the court or defense counsel; and 3) if this court would accept Mr. Lehner's testimony as though on trial and hear argument on the motions, the case could be submitted on that basis. Defense counsel agreed that the entire record could be closed following oral argument, but reserved the right to submit additional evidence and testimony if Crane's motions for summary judgment were denied.

It is unnecessary to decide defendant's motions, however. I shall instead rule on the basis of the entire record because plaintiff's case, as submitted, is simply insufficient to sustain the requisite burden of proof.

To the extent I am required by F.R.Civ.P. 52(b) to make Findings of Fact and Conclusions of Law, the nature of this case and the convenience of reader suggest that these findings and conclusions be styled in narrative form.

2. Crane maintained a written vacation policy which stated that any terminated employee was entitled to unused vacation time that had been fully earned, and that the terminated employee would also receive a prorated vacation on the basis of one-twelfth of a vacation for each full month worked beyond the employee's anniversary date. Defendant's Exhibit 15; Deposition of Charles Scuron, p. 73. Based on Mr. Lehner's anniversary date, he was entitled to nine-twelfths of his normal annual vacation of four weeks at the time of his termination.

3. On the 15th, deductions were taken for bonds, medical insurance, income insurance, life insurance, and account insurance as well as for federal, state and local taxes and FICA. The last monthly pay would have a deduction for bonds.

4. Crane's pension program was first adopted in 1961. It was thereafter amended effective as of August 1, 1965, March 1, 1971, October 1, 1971, April 1, 1972, April 1, 1974, and January 1, 1976.

This letter, addressed to the plant managers and industrial relations directors at Crane's facilities, was not mailed until April 1, the date the new plan was to go into effect.

John A. Hughes, the manager at the King of Prussia plant where plaintiff had been employed, first learned on April 2, 1974, that there were going to be increases in the pension plan when he received a memorandum written in New York and dated March 25. The memo mentioned the directors' action but gave no details. It also contained a handwritten note from Hughes' superior that Hughes was not to make a local announcement until he had heard from B. M. Hutlinger, Crane's director of industrial relations. On April 10, 1974, Hughes received a Hutlinger memorandum directing him to hold meetings with plant employees to explain the changes. Hughes did so before the end of the month.

Prior to his termination, plaintiff met with both Hughes and Charles Scuron, the comptroller of the King of Prussia plant, but did not make any specific inquires as to pending changes in the pension program.[5]

Shortly after his leaving, plaintiff was informed of the pension increases by a Crane employee. Plaintiff then wrote to his former supervisor and to the employee responsible for calculating pension benefits inquiring as to what his entitlement would be on July 7, 1989, when he would reach age 65,[6] and representing that his employment had terminated on April 24, 1974, the date his accrued vacation time had expired. He

received no response to these letters. On March 16, 1976, Lehner wrote to Hukill who replied that the amount would be $242. per month, a calculation which was based on the formula applicable to employees terminating prior to April 1, 1974. Under the formula applicable to employees terminating on or after April 1, 1974, an employee with plaintiff's time and pay bracket would receive $440. per month.

Plaintiff now seeks a declaratory judgment that he is entitled to the greater pension on three grounds: 1) Crane is estopped from denying him the benefit; 2) his receipt of the accrued vacation pay postponed his retirement until after the effective date of the increases; and 3) the date he terminated work is of no significance—rather, under the plan, the important date is the one on which an employee "qualifies," that is, attains a stated age and applies for the pension. I shall consider each argument separately.

## 2. Crane was under no duty to disclose the impending increases.

■ The first aspect of plaintiff's claim is that defendant had some duty to advise him of significant information, known to defendant but not to plaintiff, which would have had a direct bearing on plaintiff's decision to leave Crane. Although plaintiff has not pointed to any specific theory or case on which he relies, it appears that Section 551 of the Restatement (Second) of Torts,[7] which defines the circumstances in

5. Lehner testified that he asked Scuron about his pension in general and how he would go about establishing his rights to a pension and that Scuron replied he would receive a letter from New York which would include the relevant information. Deposition of William A. Lehner, pp. 24–27. Scuron testified he did not recall any such conversation. Scuron Deposition, p. 51. To the extent this discrepancy represents a factual dispute, I find it is not material to a resolution of this matter.

6. Plaintiff is a deferred vested pensioner. Under the terms of Crane's 1965 amendments to the pension plan, covering all retirements on or after August 1, 1965, deferred pensioners may only first apply to receive a pension 90 days

before their sixty-fifth birthday. See Defendant's Exhibit 10.

7. § 551. Liability for Nondisclosure

(1) One who fails to disclose to another *a fact that he knows may justifiably induce the other to act or refrain from acting* in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated;

which liability for nondisclosure may be imposed, is applicable. It provides that not only must there be knowledge but also a duty to disclose this information. Under the circumstances of this case, neither element was present.

First, Crane had no knowledge and Lehner has not shown that his lack of knowledge was relevant. Lehner's decision to resign was made before Crane decided to change its pension plan—in fact, Lehner's decision was made and communicated to his supervisors even before Hukill was directed to submit a proposal for increased benefits to Crane's president. Moreover, none of the people who were aware of the pension increases knew that plaintiff had decided to terminate his employment, and none of the individuals who were aware of Lehner's decision to resign had any idea that the corporation's executives had the slightest thought about a change in the pension program. Then too, plaintiff has not shown that even had he been informed of the increased benefits he could have retained his job just because at that point he may have wished to do so,—after all, the board's action in adopting the change was not made until March 25, four days before Lehner's last day of work. It is entirely possible

(a) matters known to him that the other is entitled to know because of a *fiduciary or other similar relation of trust and confidence between them;* and

(b) *matters known to him that he knows to* be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts (emphasis added).

8. Obviously plaintiff has the burden of proof. The problem is essentially one of causation.

that by that time Lehner's replacement had been chosen and the succession process had been so far advanced that Crane would not have reversed it no matter what Lehner then wanted.[8]

■ Second, none of the conditions for the existence of a duty to disclose existed. The mere fact that an employer administers a pension program for the benefit of its employees does not give rise to a fiduciary relationship;[9] one must demonstrate a relationship involving trust and confidence, and the "proof must show confidence reposed by one side and domination and influence exercised by the other." *Gross v. University of Chicago,* 14 Ill.App.3d 326, 302 N.E.2d 444, 453-54 (1973). Moreover, an employer-employee relationship does not, in and of itself, give rise to a fiduciary relationship from which a duty to disclose could be derived. *Vargas v. Esquire,* 166 F.2d 651 (7th Cir. 1948); *Hurd v. Illinois Bell Telephone Company,* 136 F.Supp. 125 (N.D.Ill. 1955), aff'd 234 F.2d 942 (7th Cir.), cert. denied sub nom. *Seybold v. Western Electric Co.,* 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124; *Gross v. University of Chicago,* supra, 302 N.E.2d at 454. In this case,

Plaintiff must show that he lost the increased benefits because corporate officials failed to disclose their existence to him. In turn, this means he must show he could have retained his job after March 29 despite his resignation. He has offered no such proof. At best, he has said he would have stayed at Crane for some additional period beyond April 1, Lehner Deposition, p. 67, which is not the same as proving that Crane would have been willing at that point to keep him. For reasons which would have had nothing to do with the pension program, Crane may have decided that retaining Lehner's replacement was preferable to retaining him.

9. It is clear from a reading of Section 551(2) that only a fiduciary duty would require Crane to have acted in this instance, since all of the other circumstances mentioned in subsection (2), save (2)(e), refer to representations already made. Subsection (2)(e) is not applicable here, simply because I have already concluded that Crane did not know that plaintiff was about to make a decision, even if that decision was based on facts as to which he was mistaken.

it is evident that defendant acted quickly and efficiently in disseminating notice of the changes. The delay between official adoption of the increase proposal and the day notice reached Crane's local plants was caused solely by management's desire to define clearly the new program and the time this notice was lodged within the postal system. Thus, even if I were to find plaintiff had established a fiduciary relationship and a corresponding duty to disclose, I would also have to conclude Crane acted reasonably in making the disclosure.

To the extent plaintiff's claim may be predicated on a theory of fraud, the record provides no factual basis for any such finding. Because local Crane personnel were unaware of the pending changes, there was no one in a position to advise plaintiff one way or the other as to the course he should take, nor was there any evidence that he asked for advice. None of the corporate headquarters' personnel even knew Lehner was an employee, let alone that he was leaving. Therefore, it can hardly be said that Crane realized or should have realized that there was some reason to disseminate information dealing with the pension change to any or all employees as soon as a decision to increase had been made. Moreover, silence can only be equated with fraud where there is some duty to speak. *United States v. Prudden*, 424 F.2d 1021, 1032 (5th Cir.), cert. denied 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); *Simpson Timber Company v. Palmberg Construction Co.*, 377 F.2d 380, 384 (9th Cir. 1967). Since I have already concluded that Crane possessed no duty to disclose, none of the factors necessary to find fraud are present here.

### 3. *Plaintiff was not an employee as of April 1, 1974.*

Plaintiff's second contention is that he did not intend his termination to be effective prior to April 1, 1974, and the fact that he received pay for three weeks accrued vacation extended his period of employment well beyond that date. Although there is little case law on the effect of vacation pay on the date of termination, the record clearly establishes that both parties intended March 29, 1974, to be Mr. Lehner's last day of employment and that they acted accordingly thereafter.

It is obvious the company fully believed that Mr. Lehner was no longer a Crane employee after March 29, 1974. His name was taken off the payroll register. Deductions normally taken out of his pay were not noted on the deductions register for April 15, 1974. In addition, Crane had every right to believe that plaintiff was terminating his employment effective March 29. After first stating his desire to leave on March 15, Mr. Lehner agreed that he would stay until March 29, 1974. The personnel forms executed by plaintiff prior to his leaving both show that March 29 would be his last work day. The record is equally clear that plaintiff had accepted employment at Catalytic, Inc., to begin April 1, 1974, and that he fully intended to honor that commitment. Deposition of Lehner, pp. 14–16. He could not have worked for both employers.

Plaintiff asserts that the testimony of John Hukill demonstrates that his actual date of termination is in dispute, but it is obvious plaintiff has distorted what Hukill actually said.[10] Plaintiff points to the em-

10. Q. In regard to the application of pension benefits, what is the company's policy with respect to the granting of accrued vacation benefits?

Mr. Eustace: I have an objection. You go ahead.

A. That if he is entitled to accrued vacation but not otherwise taken, he is to be paid this accrued vacation. And if it is not taken prior to the date of company termination, he is paid in a lump sum, and does not extend his time of employment.

Mr. Eustace: I would object, and ask that that be stricken off.

Q. What determines the date of termination?

Mr. Eustace: Objection.

A. The employee's personnel record, as far as the Retirement Committee is concerned.

Q. I refer you to a document that has been previously marked as plaintiff's Exhibit 1 for identification, and ask you to turn to the second page of that document.

At the top of that second page, there is large lettering that says, "Change of employee sta-

phasized portion of Hukill's deposition for support. However, Hukill was simply responding to a hypothetical and, when read in its proper context, his testimony completely supports defendant's contentions. He stated that accrued vacation pay did not extend the period of employment, that the date of termination would be shown by the personnel records, and that the relevant personnel forms established March 29, 1974, as plaintiff's date of termination.

In *Monroe v. Penn-Dixie Cement Corporation*, 335 F.Supp. 231 (N.D.Ga.1971), plaintiff was discharged as of May 17, 1968. He argued, however, that his employment continued for five additional weeks since he was entitled to and received five weeks' accrued vacation pay. The date of his employment termination was important because his claim against the defendant, his former employer, was based on the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq., which became effective during that five week period. Ruling against plaintiff, the court held the paid vacation time did not change the date of his discharge, a vacation with pay being, in effect, only additional pay for work already done. Although plaintiff had a contractual or quasi-contractual right to the vacation pay when he was discharged, the right to receive pay did not include the right to continue as defendant's employee. Since the Age Discrimination Act had not become effective when plaintiff was discharged, he had no cause of action based on its provisions. *Id.* at 234. That reasoning is equally applicable here. Mr. Lehner's right to receive the vacation pay resulted from his having worked nine months past his employment anniversary date. His right to vacation pay, however, cannot be construed to extend the employment relationship be-

tus," and directly below that it states, "Effective date 3–29–74." And then it has the name of the employee, William A. Lehner.

In reading this document, can that document tell you the last day that Mr. Lehner was an employee of Crane Co.?

Mr. Eustace: Objection.

A. In reading the whole paper, yes.

Q. Okay. And what does that document tell you?

A. It shows the effective date of the change, and the change referred to below says, "Removed from payroll and terminated." And the effective date being March 29, 1974.

Q. The fact that Mr. Lehner received an additional check for his accrued vacation time— does that affect the date of termination?

Mr. Eustace: Objected to.

Q. Or extend the date of his termination?

Mr. Eustace: Objected to.

A. We would not so interpret it, no.

Q. And what is the reason you would not interpret it that way.

Mr. Eustace: Objected to.

A. We have experienced many cases over a period of time of retirements of similarly situated conditions, and it has been so documented that where a man is removed for retirement purposes and paid a lump sum accrued vacation, it has never extended his time of employment beyond that date.

Mr. Eustace: I ask that that be stricken out.

Q. If the lump sum payment had the effect of extending his employment with the company, would that not also affect the date he would first become eligible for a pension?

A. It could, if it extended over the end of the month in which he was terminated.

Q. In other words, if the vacation pay were counted as time in which he was within the employment of the company, it would also delay the date at which he would become eligible for a pension?

A. If said period carried him over into a new month. What I'm saying is, a man may have been terminated March 2 and then had two weeks' vacation. It is still within the month of March, and it would have no application.

But if he were terminated March 20 and he had three weeks' vacation, which extended it into April, then that would delay his pension one month.

Q. Under the present procedure, an employee who retires, who also received the lump sum payment, would nevertheless begin his pension one month after the date of his termination? [for non-deferred vested pensioners].

Mr. Eustace: Objected to.

A. As so designated, yes, in the personnel records.

Q. Yes. Let me state it once again. The fact that an employee received a lump sum payment for accrued vacation time would not affect his date of termination—

Mr. Eustace: Objected to.

Q. —with respect to determining the date his pension benefits would begin?

A. That's right.

Deposition of John Hukill (emphasis added), pp. 56–59.

**1134**

yond the date he chose as the effective date of his resignation.[11]

### 4. *The pension plan increases do not apply to employees who terminated their employment prior to April 1, 1974.*

Plaintiff's final argument is that the increases should be made applicable to pensioners who, although terminating prior to April 1, 1974, do not apply for pension benefits until after that date. This contention rests on the wording of the resolution passed on March 25, 1974,[12] and the Crane Pension Plan implemented in 1965.[13] Lehner points out that under the terms of the plan he cannot receive benefits until 1989. At that time, no less than 90 days before he reaches 65 and as a prerequisite for payment, he will have to submit a formal application. Thus he argues he will not "qualify" for his pension until after March 31, 1974, and is therefore entitled to the increased amount. Defendant, on the other hand, contends that the operative date is not the date of application, but the date when employment terminates, i. e. a pensioner must have been an employee as of April 1, 1974, in order to "qualify" for the greater payments.

Plaintiff's argument, in essence, is premised on his assertion that "qualify" in this instance should be equated with his performance of the mechanical tasks necessary to trigger payments, such as the completion of the pension application forms. There is some support for the position that "qualify" refers to the routine acts necessary to obtain some benefit for which prior eligibility exists. In *Bradley v. Clarke*, 133 Cal. 196, 65 P. 395 (1901), the California Supreme Court, in interpreting a state constitutional provision, found that "eligible" means capable of being chosen, while "qualified" refers to one who has taken the official oath and executed the official bond. See also *Holley v. Adams*, 238 So.2d 401 (Fla.1970). But there are also many instances where "qualify," as used in a statute, has been construed to mean something more than the performance of these minor acts. Where reemployment was sought by an individual returning from duty in the armed services, the word "qualified" as used in the Military Selective Service Act meant that the veteran must have the requisite mind, temperament, and character for the position. *Trusteed Funds v. Dacey*, 160 F.2d 413, 420–21 (1st Cir. 1947); *Greathouse v. Babcock and Wilcox Company*, 381 F.Supp. 156, 163 (N.D.Ohio 1974); *Bozar v. Central Pennsylvania Quarry, Strip & Const. Co.*, 73 F.Supp. 803, 811 (M.D.Pa. 1947). "Qualify" has also been equated with "eligible." For instance, in *Associated Transport, Inc. v. Fowler*, 206 Tenn. 642, 337 S.W.2d 5 (1960), the court dealt with an application for a transfer of certificates of convenience granted for the transportation of freight and whether the purchaser was "in all respects qualified." The court construed this provision to entail an examination of the purchaser's financial condition, the applicant's character, and its ability to

---

**11.** Plaintiff cites *Siss v. United States Steel Corporation*, 34 Ill.App.3d 62, 339 N.E.2d 279 (1975), for the proposition that vacation time continues employment. In that case, however, neither party intended to terminate the employment relationship, plus plaintiff's accrued vacation time had already been taken prior to his termination.

**12.** NOW, THEREFORE, BE IT RESOLVED, that effective as of the close of business on March 31, 1974, the Crane Companies' Pension Plan shall be amended to provide, as follows:
(a) the monthly amount of any pension allowance granted to an Employee *who first qualifies* for and is granted a pension after March 31, 1974, shall be the greater of . .

(b) An *eligible* Employee *who first qualifies for* and is granted a pension after March 31, 1974, other than by reason of his normal retirement, shall have . . . (emphasis added).
Defendant's Exhibit 8.

**13.** SECTION IV

Retirement
Any employee eligible for retirement under this Plan shall be retired on his application . . . Application for a deferred vested retirement pension must be made to the Employing Company by an applicant otherwise eligible thereof, not earlier than ninety (90) days prior to his sixty-fifth birthday . . . Defendant's Exhibit 10, p. 14.

render service. In *United States v. Blasius,* 397 F.2d 203 (2d Cir. 1968), cert. dismissed 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969), an attorney was convicted of making representations that he was "qualified" to prepare applications for a patent although he was not recognized to practice before the patent office. The court found that "qualified," as used in the criminal statute, carried "its primary and more ordinary meaning of possessing particular skill or 'know-how' in performing certain tasks or functions rather than the more legalistic meaning . . . [of] having formal legal authority to perform particular tasks or functions . . ." *Id.* at 206.

It is therefore clear that "qualified" may have at least two different meanings— it may refer to one who has a particular status through some endowment, acquisition, or achievement, or it may describe one who has obtained appropriate legal power or capacity by taking an oath, completing a form, or complying with some other routine requirement. Complicating this matter, of course, is the fact that both "eligible" and "qualified" are used in the same provision in the March 25, 1974, resolution. Despite the strength of plaintiff's arguments, I find that the more reasonable interpretation is the one advanced by defendant. While I agree "that application within the specified periods is *a* mandatory step to in any way 'qualify' as that word means in its ordinary sense, for pension benefits," Plaintiff's Memoranda In Answer to Defendant's Reply Memoranda, p. 3 (emphasis added), I also conclude that the critical factor necessary for qualification was employment as of April 1, 1974.

The pension plan provides that it is to be interpreted in accordance with the laws of Illinois. Defendant's Exhibit 10, p. 17 (Section VI, par. 8). Under Illinois law, a voluntary pension plan [14] is subject to the normal rules of contract interpretation. *Guinzy v. Curtice Burns, Inc.,* 28 Ill.App.3d 398,

327 N.E.2d 284, 286 (1975) ("rights of the participants under a private pension plan are governed by the terms of the plan"). It is not necessarily subject to the rule that it must be construed against its author, Crane, as plaintiff contends. This argument was addressed and rejected in *Hurd v. Illinois Telephone Company,* supra, where the district court found:

> The plaintiffs have relied on this rule as a command to adopt each interpretation of the Bell Plan which they put forward. But it can have no such effect. At best it is a secondary rule of interpretation, a "last resort" which may be invoked after all of the ordinary interpretative guides have been exhausted and there remain two or more reasonable interpretations of the language in question (citations omitted). The defect in the plaintiffs' case is that they have applied none of the other principles of interpretation. Rather, they have isolated certain words or phrases and assigned to them a precise meaning which was designed to create ambiguity and then resolved the resulting ambiguity in their own favor. Such a course would not lead to a proper interpretation of the contract. The court has at all times been guided by what it finds to have been the principal purpose of the . . . [plan] and particularly of the provisions in issue here and by what the language was intended to mean and known by the plaintiffs to mean. *Id.* at 134.

Guided by the principal purpose of the 1974 resolution, I must agree with Crane.

First, if I were to accept plaintiff's argument, it would result in a situation where employees who retired prior to April 1, 1974, and who chose to take a deferred pension could receive greater benefits than retirees who also left employment prior to April 1, 1974, but who opted for an immediate pension, simply because the former chose to apply for a pension at a later date.

14. This Plan is strictly voluntary on the part of the Employing Companies, and shall not be deemed to constitute a contract between any one or more of the Employing Companies and any Employee, or to be a considera-

tion for, or an inducement or condition of, the employment of any employee.

Defendant's Exhibit 10, p. 16 (Section VI, par. 1).

There is no indication that the pension plan amendment was designed to favor those who delayed their applications.

Second, my conclusion is consistent with the intention of Crane's management and the circumstances surrounding the adoption of the proposal. John Hukill testified that it was management's intention that the benefits would not cover employees who had terminated prior to April 1, 1974. There is also a document issued by Crane on April 11, 1974, and formulated to assist the local plant managers in explaining the changes to company personnel. It consists of a series of anticipated questions of employees concerning the changes, and the answers that management recommended be given in response. The thirteenth question and suggested answer were:

> 13. Does [sic] new pension figures affect DVP's [deferred vested pensioners] terminating before April 1, 1974 who are not eligible for pension rights until much later date?
>
> ANSWER: No.

Defendant's Exhibit 4, p. 5.

█ Illinois law provides that courts should defer to the decisions of those vested with the responsibility of administering a pension program, so long as those decisions are not arbitrary or capricious, and are made in good faith. *Munts v. Fitzsimmons*, 25 Ill.App.3d 109, 323 N.E.2d 153, 155–56 (1975) ("In absence of vagarious conduct we will not disrupt that function and we find no impropriety on the part of the trus-tees"); *Anderson v. Seaton*, 14 Ill.App.2d 53, 143 N.E.2d 59, 61 (1959) ("in the absence of fraud or such gross mistake as would necessarily imply bad faith or a failure to exercise honest judgment"). Crane's pension plan gives the company complete authority to administer and interpret the plan.[15] Plaintiff has made no showing that the decision in this case was made arbitrarily, capriciously or in bad faith.

█ For these reasons,[16] I find that plaintiff has failed to establish that he was entitled to the increased pension benefits. Crane was under no duty to disclose to him the impending changes in the program, but even if such a duty existed, the company acted reasonably. His receipt of accrued vacation pay did not extend his employment beyond the date he physically terminated from the company. Finally, merely because he could not apply for a pension until after the effective date of the improved benefits did not qualify him for the increase.

---

**15.** Section V of the plan (Defendant's Exhibit 10, p. 15) provides:

1. This plan shall be administered by the Corporation.
2. The Corporation shall have the exclusive right to interpret the Plan and to decide any matters arising thereunder in the administration and operation thereof. Decisions or actions in this respect shall be conclusive and binding on all persons having any interest in the plan.

**16.** Defendant has also advanced case law for the proposition that the pension plan is a gratuity which the company has voluntarily granted to the employees and not a contract enforceable by plaintiff. See *Hughes v. Encyclopaedia Britannica*, 1 Ill.App.2d 514, 117 N.E.2d 880 (1947). But it appears to be more settled that the creation of an employees' pension plan constitutes an offer of a unilateral contract subject to acceptance by an employee who completes a specific performance. Upon performance of all the conditions of the offer the employee's right to the benefits vests and there is a binding contract. *Hardy v. H. K. Porter Co., Inc.*, 417 F.Supp. 1175, 1183 (E.D.Pa.1976); *Siegel v. First Pennsylvania Banking & Trust Co.*, 201 F.Supp. 664, 666–67 (E.D.Pa.1961). However, this would not help plaintiff. Crane's offer to change the pension plan by increasing the size of payments could not be accepted by Mr. Lehner since his termination on March 29, 1974, precluded any performance on his part in reliance on that offer.