### UNITED STATES of America

v.

### KENSINGTON HOSPITAL, et al.

### Civ. A. No. 90–5430.

United States District Court, E.D. Pennsylvania.

March 13, 1991.

Virginia Gibson–Mason, Michael J. Rotko, U.S. Atty's Office, Civil Div., Philadelphia, Pa., for U.S.

Brian M. Peters, Post & Schell, P.C., Edward C. Mengel, Jr., Richard J. Bortnick, White and Williams, Robert E. Welsh, Jr., James M. Becker, Michael Stuart Weisberg, Richard A. Sprague, Philip I. Weinberg, Hugh J. Bracken, Sprague, Higgins, Creamer & Sprague, Howland W. Abramson, Lewis J. Hoch, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for defendants.

## OPINION

VANARTSDALEN, Senior District Judge.

### I. INTRODUCTION

In this complex action, the government has filed a complaint alleging Medicare/Medicaid fraud by Kensington Hospital (Kensington); a Kensington Hospital administrator Eileen Hause (Hause); Parkway Laboratories (Parkway); and seven individually named doctors: Nelliate Shyamalan, M.D. (Shyamalan); Tarun Ray, M.D. (Ray); Felix Spector, D.O. (Spector); Erich A. Everts, M.D. (Everts); Warren Goldfeder, M.D. (Goldfeder); Jack M. Magill, D.D.S. (Magill); and Edgar Escobar, M.D. (Escobar) (hereafter collectively referred to as the doctors).

The government filed its original complaint containing nine counts on August 20, 1990. In October, and early November, 1990, all the defendants except Parkway submitted numerous motions: motions to dismiss, motions for partial summary judgment, and motions for a more definite statement. Parkway and the government stipulated to an extension of time, and Parkway entered its answer and affirmative defenses on February 1, 1991. On December 21, 1990, the government submitted its consolidated response to defendants' motions, and then filed its first amended complaint containing the same nine counts as the original complaint on January 11, 1991.

In Count I, the government charges all defendants with violations of the False Claims Act. 31 U.S.C. § 3729 et seq. Count II alleges that Kensington, Hause and Spector induced others to breach their fiduciary duties to the Medicare/Medicaid Trust Funds. Count III seeks damages from Shyamalan, Ray, Everts, Goldfeder, and Magill for breaches of their fiduciary duty to the Medicare/Medicaid Trust Funds. Counts IV through VIII are common-law claims against all the defendants: Count IV for common-law fraud; Count V for unjust enrichment/restitution; Count VI for payment under mistake of fact/restitution; Count VII for negligent misrepresentation; and Count VIII for fraudulent misrepresentation. Finally, Count IX contends that Kensington, Hause, Shyamalan, Ray, Spector, Goldfeder, and Magill violated the Anti–Kickback Act, 41 U.S.C. § 51 et seq.

All of the defendants, except Parkway and Magill, responded to the first amended complaint by renewing their earlier motions and providing additional briefing on issues raised by the government's response brief, and issues raised in the first amended complaint.[1] Magill entered an answer and af-

---

1. Some of the defendants' motions in response to the first amended complaint differ from their motions regarding the original complaint. For example, Spector filed a motion to dismiss, and a motion to strike, or, in the alternative, for a more definite statement regarding the original complaint, but he only filed a motion to dismiss the first amended complaint. Similarly, Magill filed a motion for a more definite statement after the original complaint was filed, but he has answered the first amended complaint.

As no one disputes that the first amended complaint was properly filed, I shall treat the motions concerning the original complaint as

firmative defenses to the first amended complaint.

The outstanding motions by defendants as to the first amended complaint are: (1) Spector's motion to dismiss; (2) Goldfeder's motion to dismiss, motion for summary judgment as to Counts II through VIII, motion for a more definite statement and motion to dismiss for failure to satisfy Rule 9(b); (3) Shyamalan and Ray's motion to dismiss Counts III, IX and V (in part), and motion for partial summary judgment as to Counts III through VIII, and Count I (in part); (4) Escobar's motion to dismiss Count V (in part) and motion for partial summary judgment as to Counts IV through VIII and Count I (in part); (5) Everts' motion to dismiss; (6) Kensington and Hause's motion to dismiss Counts II, III, IX, and V (in part) and motion for partial summary judgment as to Counts II through VIII, and Count I (in part); (7) Hause's individual motion to dismiss all counts except Count V; (8) Kensington and Hause's motion for protective relief concerning the Nihill and Riedley Report; and (9) Kensington and Hause's motion to limit discovery which is incorporated by reference by other defendants.

I will address all these motions. While the defendants have filed many briefs, most of the pleadings repeat essentially the same arguments against the government's complaint, as the government recognized in its consolidated response. Moreover, many of the defendants incorporate by reference the arguments made by other defendants in their briefs. For example, Spector incorporates by reference arguments made by Kensington, Hause, Everts, and Goldfeder. *See* Spector's Motion to Dismiss at 2, 7. Shyamalan, Ray, and Escobar incorporate by reference arguments made by Kensington and Hause. *See* Escobar's Motion to Dismiss at 1; Shyamalan and Ray's Motion to Dismiss at 1.

First, I will dispose of all the motions concerning the specificity of the complaint,

that is, the motions for a more definite statement, and the motions to dismiss for failure to satisfy Rule 9(b).

## II. MOTIONS FOR A MORE DEFINITE STATEMENT WILL BE DENIED

██ Goldfeder has moved for a more definite statement under Rule 12(e), and has also filed a motion to dismiss for failure to satisfy Rule 9(b). Hause bases her motion to dismiss Counts I, IV, and VIII on the failure to satisfy Rule 9(b). Everts, too, argues that Count I should be dismissed because the first amended complaint does not meet the requirements of Rule 9(b). Throughout their briefs, other defendants make reference to the lack of specificity in the government's original complaint, but, as I read the pleadings, no other defendant has expressly asked for dismissal of the complaint on these grounds.

I agree with the defendants that the original complaint showed a disturbing propensity to use the term "defendants" throughout, when clearly the factual allegations referred to activities that could not have involved all of the defendants. This type of group pleading fails to provide defendants with adequate notice, and reveals a lack of attention to detail by the government.

The amended complaint has attempted to remedy the problems arising from the liberal use of "defendants" by specifically identifying the defendants referred to in each paragraph. At times, this has resulted in simply substituting the individual names of all the defendants for the term "defendants." *Compare, e.g.,* ¶ 79 of the original complaint, *with* ¶ 87 of the first amended complaint. In other instances, these changes have provided greater detail. *Compare, e.g.,* ¶¶ 17, 22, 28, 50 of the original complaint *with* ¶¶ 18, 23, 28, 51 of the first amended complaint.

---

having been superseded by the first amended complaint, and will only address the motions concerning the first amended complaint. This will have limited practical effect, however, because many defendants responded to the first

amended complaint simply by renewing their motions concerning the original complaint. *See, e.g.,* Everts' Renewed Motion to Dismiss at 2; Kensington and Hause's Reply at 18.

The first amended complaint cures many of the defects of the original complaint and obviates the need for requiring a more definite statement. Counsel for the defendants noted at oral argument that the first amended complaint was "helpful." While the government could have given more detail, the defendants now have adequate notice of the activities with which they are charged for pleading purposes.

Some of the contentions may be inferred from the complaint. For example, the Assistant United States Attorney explained Count I at oral argument. She stated that because Escobar and Spector were allegedly suspended from Medicaid participation (First Amended Complaint at ¶¶ 28 and 71), they caused fraudulent bills to be submitted by Kensington rather than submitting fraudulent bills themselves. Because of Kensington's centralized billing system (First Amended Complaint at ¶¶ 22, 26, 27), many of the bills were processed by Kensington, even on behalf of doctors who were not suspended, such as Magill and Everts. In these cases, the doctors again "caused" the fraudulent bills to be presented to the government, rather than submitting the bills themselves.

Discovery can provide defendants with all necessary details about the particulars of their alleged unlawful activities. As I noted at oral argument, the government at some point shall have to clarify exactly who is charged with precisely what activity, but through discovery defendants will be able to obtain this information. It is not necessary to order the government to redraft the complaint to include these detailed allegations at this time. I shall probably require the parties to submit a final pretrial order pursuant to Local Rule of Civil Procedure for the United States District Court for the Eastern District of Pennsylvania 21(d)(2). That order should dispel any remaining uncertainty.

The first amended complaint thus withstands a motion for more definite statement under Rule 12(e). Fraud allegations, however, are governed by Rule 9(b), which has higher requirements of particularity than those imposed by Rule 12.

### III. MOTIONS TO DISMISS FOR FAILURE TO MEET RULE 9(b) REQUIREMENTS WILL BE DENIED

■ "The standard for 9(b) is a generous one in this Circuit," *Blue Line Coal Co. v. Equibank*, 683 F.Supp. 493, 497 (E.D.Pa. 1988) (citations omitted), and the Third Circuit Court of Appeals has cautioned that "focusing exclusively on [Rule 9(b)'s] particularity language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" *Christidis v. First Pa. Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 407 (1969)). Rule 9(b) does not require date, time, and place allegations, provided that the plaintiff gives the defendants other means of precision and substantiation. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985).

■ Although a close question, I conclude that the government's first amended complaint contains enough specificity to withstand a Rule 9(b) challenge. While the government does not describe every instance of alleged fraudulent conduct, it states enough particulars to put the defendants on notice of the fraud with which they are charged. For example, paragraphs 14, 25, 28, 33, and 41, among others, include dates which identify the time periods during which the alleged fraud occurred. The paragraphs regarding the different clinics identify some of the locations of the alleged fraud. Paragraph 53 depicts eight examples of supposed relationships between Kensington and members of its Board of Directors which allegedly makes Kensington's certifications fraudulent. Paragraph 65 specifies at least six alleged kickback schemes between Kensington and its vendors, and paragraph 76 lists six types of alleged kickbacks received at the Columbia Clinic.

■ Rule 9(b) was not intended to require a plaintiff to know every detail before he or she could plead fraud. Its pur-

pose was to prevent general allegations of fraud that did not give defendants fair notice of the charges against them. Also, Rule 9(b) was to preclude spurious or totally unfounded claims of fraud. *See Seville,* 742 F.2d at 791 (Rule 9(b)'s requirements are "to safeguard defendants against spurious charges of immoral and fraudulent behavior"). *See also In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig.,* 467 F.Supp. 227, 250 (W.D.Tex. 1979); *Lincoln Nat'l Bank v. Lampe,* 414 F.Supp. 1270, 1278–79 (N.D.Ill.1976); *Macchiavelli v. Shearson, Hamill & Co., Inc.,* 384 F.Supp. 21, 28 (E.D.Cal.1974); *duPont v. Wyly,* 61 F.R.D. 615, 630 (D.Del.1973); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1296, at 577–81 (1990). In the present situation, the government has sufficiently identified the schemes of fraudulent behavior in which the defendants allegedly engaged. As noted earlier, full particulars will have to be revealed during discovery, and a pretrial order should clarify any remaining uncertainty.

Therefore, I will deny Goldfeder's, Everts', and Hause's motions for a more definite statement, and motions to dismiss for failure to meet Rule 9(b) requirements.

## IV. MOTIONS CONCERNING COUNT I WILL BE DENIED

Count I charges all defendants with violations of the False Claims Act, 31 U.S.C. § 3729 et seq. Spector and Goldfeder seek to have Count I dismissed against them because it fails to state a claim upon which relief can be granted. Shyamalan, Ray, Escobar, and Goldfeder[2] have moved for partial summary judgment on Count I, asserting that they are entitled to summary judgment on all claims for sums paid before August 22, 1984. Those claims, they argue, are time-barred. Spector also moves to dismiss (rather than for partial summary judgment) on statute of limitations grounds.

### A. *Standards for Deciding the Motions*

▬ The standards for a motion to dismiss and a motion for summary judgment are very different. A motion to dismiss tests the legal sufficiency of the complaint. *Sturm v. Clark,* 835 F.2d 1009, 1101 (3d Cir.1987). A court may grant a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted only if it appears beyond doubt that the plaintiffs can prove no facts to support the relief requested. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Commonwealth ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 179 (3d Cir. 1988). In deciding a motion to dismiss, the court must accept as true all well-pled factual allegations of the non-moving party, and must view all reasonable inferences from these facts in the light most favorable to the non-moving party. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Wisniewski v. Johns–Manville Corp.,* 759 F.2d 271 (3d Cir.1985).

▬ A motion for summary judgment, on the other hand, is appropriate only when there is no genuine issue of material fact, and one party is entitled to judgment as a matter of law. *Williams v. West Chester,* 891 F.2d 458, 463–64 (3d Cir.1989). In a motion for summary judgment, the court may examine evidence beyond the pleadings. The court must always consider the evidence, and the inferences from it, in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987); *Baker v. Lukens Steel Co.,* 793 F.2d 509, 511 (3d Cir.1986). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). For a dispute to be

---

**2.** Kensington and Hause had also originally joined the motion for partial summary judgment, but their counsel withdrew this motion at oral argument. While many of the other defendants had made this argument by incorporating Kensington and Hause's arguments by reference, the remaining motions for partial summary judgment were not expressly withdrawn at oral argument, and are still outstanding.

"genuine," a reasonable jury must be able to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

### B. *Motions to Dismiss for Failure to State a Claim*

■ Spector's and Goldfeder's motions to dismiss will be denied. They both argue that nothing in the original complaint alleges facts that could establish that either submitted any false claim to the government. At oral argument, Spector's and Goldfeder's attorneys repeated that only after the government received their objections to the original complaint did it add paragraphs 83–84, which allege that the kickbacks were included in the costs of Medicaid reimbursement and were for services not medically necessary. Spector's counsel emphasized that the mere existence of a kickback cannot prove the claim was false. He relied on *United States v. Killough*, 848 F.2d 1523 (11th Cir.1988), and *United States v. Azzarelli Constr. Co.*, 647 F.2d 757 (7th Cir.1981), for the proposition that the government must prove injury before it can recover under the False Claims Act. He argued that since the level of reimbursement is fixed under Medicaid, the government suffered no loss, no matter what the doctors did with the payment they received.

Neither Spector nor Goldfeder can deny, however, that the first amended complaint includes allegations that the Medicaid payments were for services not medically necessary. *See* First Amended Complaint at ¶¶ 82–84. Payment for services not medically necessary clearly constitutes an injury to the government sufficient to withstand a motion to dismiss. *See United States v. Lorenzo*, 1991 WL 4415 (E.D.Pa., January 11, 1991) (No. 89–6933) (McGlynn, J.) (dentist ordered to reimburse government and pay penalties under the False Claims Act for fraudulent Medicare claims).

■ Moreover, controlling Supreme Court and Third Circuit precedents hold that the government need not show actual damage in order to prove a violation of the False Claims Act. *See Rex Trailer Co., Inc. v. United States*, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956); *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943); *United States v. Rohleder*, 157 F.2d 126 (3d Cir.1946).[3] In *Marcus*, electrical contractors submitted fraudulent bills to the government for work on numerous projects. In some instances, the government discovered the fraud before payment was made. "The District Court held that failure to show actual damage in these instances would not preclude recovery under the [False Claims Act]. *United States ex rel. Marcus v. Hess*, 41 F.Supp. 197, 218 [ (W.D.Pa.1941) ]. The judgment of the District Court was affirmed here." *Rex*, 350 U.S. at 153 n. 5, 76 S.Ct. at 222 n. 5 (explaining *Marcus*); *Marcus*, 317 U.S. 537 at 552–53, 63 S.Ct. at 388–89. *Rex* reaffirmed *Marcus'* holding that "there is no requirement, statutory or judicial, that specific damages be shown" to prove a violation of the False Claims Act. *Rex*, 350 U.S. at 152, 76 S.Ct. at 221. The Third Circuit Court of Appeals declared this rule in *Rohleder* when it stated the False Claims Act "permits recovery ... thereunder without actual damage being proven." *Rohleder*, 157 F.2d at 129. Consequently, Spector's and Goldfeder's argu-

3. Counsel for the government at oral argument several times referred to *United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 988, 106 S.Ct. 396, 88 L.Ed.2d 348 (1985), as if it created a presumption of injury resulting from a kickback. I do not read the Third Circuit Court of Appeals' opinion in that manner. First, the opinion does not strictly bind me here because *Greber* concerned the statute criminalizing Medicare fraud, 42 U.S.C. § 1395nn(b)(2)(B), not civil penalties resulting from such fraud. Secondly, the jury instructions challenged in that case required the government to prove all the elements of its case, rather than rely on presumptions. *Id.* at 71. *Greber* notes the potential for injury to Medicare/Medicaid from kickbacks, but requires that the government prove the violation. *Id.* at 71–72. *Greber* simply holds that the criminal anti-kickback statute is violated even if the payments compensated for some services, as well as including a kickback. *Marcus, Rex,* and *Rohleder* are the governing cases which define the government's burden of proof to establish a violation of the False Claims Act.

ments fail because actual injury is not required for a claim under the False Claims Act.

In sum, Count I charges Goldfeder and Spector with using false records which resulted in fraudulent claims to Medicare/Medicaid. Accepting the allegations in paragraphs 82–84 as true, as I must for the purposes of a motion to dismiss, I find that the government has stated a claim upon which relief may be granted, both because receiving payment for services not medically necessary is fraudulent, and because the government need not show injury resulting from the kickbacks in order to recover under the False Claims Act. On the face of the complaint, the government has adequately pled a cause of action under the False Claims Act.

## C. *Statute of Limitations*

■ The motions for partial summary judgment, and Spector's motion to dismiss argue that claims before August 22, 1984 are time-barred. No party disputes that the relevant statute of limitations for claims under the False Claims Act is found at 31 U.S.C. § 3731. The statute of limitations provides that civil actions must be brought within six years after the date of the violations, or within three years after the date when material facts are known or should have been known by the responsible federal officials.

Defendants claim that the six year statute of limitations applies in this case and bars claims arising more than six years before the filing of the original complaint. The government responds that the statute was tolled in this case because the responsible officials did not have knowledge of the alleged wrongdoing, and submits affidavits from special agents who state that the earliest they had knowledge of the activities was October, 1987. Since the lawsuit was brought within three years of October, 1987, none of the claims is time-barred, according to the government.

Defendants' motions for summary judgment, and Spector's motion to dismiss are based on the existence of a report by a private investigation firm, Nihill and Riedley (N & R). Kensington's Board of Directors hired N & R to investigate allegations of embezzlement within the hospital. On November 4, 1986, the N & R report was presented to special agents of the government. Therefore, defendants argue, the responsible government officials had knowledge of the activities occurring at Kensington on November 4, 1986, and any tolling that might have occurred ceased on November 4, 1986. Since this suit was not brought within three years of November 1986, defendants contend that the government cannot rely on the tolling provisions, and the six year statute of limitations should apply.

The government does not dispute that the responsible government officials received the N & R report on November 4, 1986. It objects to the characterization of the report as constituting all of the "material facts." It asserts that the report contained only limited information, preliminary analysis, and that more investigation was needed before any definite conclusions could be made. Undoubtedly, Federal Rule of Civil Procedure 11 places upon both counsel and litigants a duty to carefully investigate factual allegations to be placed in a complaint, even when faced with an impending time bar.

Under these circumstances, I cannot find that there is an absence of genuine dispute about a material fact. I have not seen the N & R report; neither party filed a copy due to concerns about a pending motion for a protective order. After further discovery, a renewed motion for summary judgment may be appropriate. On the other hand, it may be that whether the N & R report provided the responsible government officials with sufficient material facts will have to be submitted to the trier of fact, along with the other issues in this case. Viewing the evidence submitted in the light most favorable to the government (the non-moving party) as I must in deciding a motion for summary judgment, it is clear for now that the defendants are not entitled to summary judgment, or dismissal, on their statute of limitations defenses.

### D. *Motion to Limit Discovery*

■ Kensington and Hause have requested in their reply (which is incorporated by reference by Shyamalan, Ray, Escobar, Spector, and Goldfeder) that, pursuant to Rule 26, initial discovery be limited to the question of the government officials' knowledge. This, I will decline to order. The defendants argue that limiting discovery would preserve judicial economy because they would be entitled to summary judgment on many of the counts since discovery would reveal the government's claims were time-barred.

Judicial economy would only be promoted if the limited discovery resulted in facts favorable to the defendants; otherwise, judicial economy would be impaired because discovery would undoubtedly take longer and probably require re-deposing some witnesses. I do not share the defendants' confidence that the evidence would so clearly establish that the responsible government officials possessed the material facts on November 4, 1986. It seems to me that this question may very well need to be resolved by the trier of fact, rather than decided as a matter of law. Therefore, it is inextricably bound up with the other facts in dispute in this case and should not be attempted to be separated out for the purposes of limiting discovery.

Accordingly, for the reasons discussed above, I will deny the motions to dismiss Count I, the motions for partial summary judgment on Count I, the motions to dismiss based on statute of limitations grounds, and the motions to limit discovery to statute of limitations issues.

### V. MOTIONS TO DISMISS COUNTS II & III WILL BE GRANTED

■ Count II asserts that Kensington, Hause, and Spector induced the doctors to violate their fiduciary duties owed to the United States. Count III charges Shyamalan, Ray, Everts, Goldfeder, and Magill with breach of fiduciary duties.[4] Kensington, Hause, Spector, Shyamalan, Ray, Everts, and Goldfeder have moved to dismiss these counts under Rule 12(b)(6).

The briefs raise a number of interesting questions. Defendants argue that the government has no cause of action for breach of fiduciary duties or for inducement to breach, that no cause of action can be implied because Congress has spoken through the Medicare/Medicaid statute, and that the government has failed to exhaust administrative remedies under 42 U.S.C. § 1320c–5 which, defendants contend, mandates review by a Peer Review Organization. The government has responded with an extensive discussion of causes of action under federal common law, the theory of statutory preemption and the role of the Peer Review Organizations. Only Everts' reply brief discusses what I perceive as the crucial issue about which I questioned the government extensively at oral argument. Simply stated I find nothing in the relationship between the doctors and the United States that creates a fiduciary duty on the part of the physicians toward the government. Because I will decide the motion on this ground, I will not address the other arguments raised in the briefs.

### A. *Nature of the Government's Alleged Fiduciary Duty*

The government asserts that the doctors are in the role of a trustee, that their patients are the beneficiaries and the Medicare/Medicaid funds constitute the trust corpus. *See* Plaintiff's Response at 24. The government claims that the statutes governing the submission of claims to Medicare/Medicaid created a fiduciary duty, and that, by making claims under the statutes, the doctors accepted their fiduciary duty. "The 'oath' [referring to the certification signed by doctors on Medicare/Medicaid claims] and contractual obligations providers undertake, coupled with the program [sic] acknowledgment of their superior knowledge of the needs of individual patients, create a duty of loyalty and faithfulness in the providers to the Trust Funds." *See* Plaintiff's Response at 18–19. The government points to 42 U.S.C. § 1320a–7b (criminal penalties under Medi-

**4.** Escobar and Parkway do not appear to be charged under Count II or Count III.

care) and 42 U.S.C. § 1320c–5 (obligations of health care providers) as defining the fiduciary duty. *See* Plaintiff's Response at 26–27.

The complaint quotes language from 42 U.S.C. § 1320c–5 to explain the alleged fiduciary duty:

physicians and orthodontists have an obligation to assure that services they provide or refer, pursuant to 42 U.S.C. [§] 1320–5:

(a) will be provided economically and only when, and to the extent, that they are medically necessary;

(b) will be of a quality which meets professionally recognized standards of health care; and,

(c) will be supported by evidence of medical necessity and quality.

First Amended Complaint at ¶ 93.

The government describes the fiduciary duty as follows:

Courts impose a duty of loyalty when the parties to a relationship repose special trust and confidence in each other because of a condition of superiority of one of the parties over the other, including superior knowledge. This precisely describes the relationship between the Medicaid/Medicare Trust Funds and the physician defendants.[5]

*See* Plaintiff's Response at 24 (citations omitted). The Assistant United States Attorney attempted to clarify the asserted trust relationship at oral argument. She stated that the Medicare/Medicaid Trust Funds were analogous to a bank; the patients were the beneficiaries; and the doctors were the trustees, much as a relative is a trustee for an orphan. The patients rely on the superior knowledge of the doctors, and that reliance is incorporated in the Medicare/Medicaid statute, as seen in section 1320c–5.[6]

I find the government's analogy implausible. I recognize that Judge Huyett permitted the government to proceed on such a theory in *United States v. Roter*, No. 89–1841 (E.D.Pa. June 8, 1989), slip op. at 4, 1989 WL 63209. However, it is unclear whether the defendant in *Roter* challenged the existence of a fiduciary duty, as the defendants do here. The opinion in *Roter* merely stated that the existence of Peer Review Organizations did not prevent the government from pursuing a theory for breach of fiduciary duties, not whether that theory would withstand a motion to dismiss.

The government's argument attempts to correlate a doctor's obligation to his or her patient with a fiduciary obligation to the Medicare/Medicaid funds.[7] Under this reasoning, any time a professional was in a fiduciary relationship with an individual, and the costs of the professional's services were paid by the government, the professional would also be in a fiduciary relationship with the government. For example, lawyers under the Equal Justice Act would thus be fiduciaries to the funds appropriated for the Equal Justice Act.

A fiduciary duty may not be forced upon someone; they must explicitly, through an agreement, or implicitly, through actions, assume the duty.

It is not enough to show that the plaintiff reposed its trust in the defendant;

This duty [fiduciary duty] is defined by the standards of the Hippocratic oath, state licensing standards and the contractual agreement to comply with the standards of 42 U.S.C. 1320c–5, 1320a–7(b), and all other laws and regulations.

*See* Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss Amended Complaint at 4.

---

**5.** This passage from the government's brief reveals another flaw in its argument. It is unclear at times who the government contends is the beneficiary of the alleged fiduciary duty: the patients or the Medicare/Medicaid Trust Funds.

Another problem is that, assuming the patients, not the government, are the beneficiaries of the trust, the government would then face standing problems which have not been addressed by any party.

**6.** The government further tried to explain its definition of fiduciary duty in its response to the motions to dismiss the amended complaint, but basically just repeated the same arguments:

**7.** I assume for purposes of argument that a doctor's obligation to his or her patient is in the nature of a fiduciary duty. It is unclear from the case law, however, whether the doctor's obligations to his or her patient creates a fiduciary obligation as to financial or billing practices.

the latter must also have accepted the fiduciary relationship. "[M]erely reposing confidence in another may not, of itself, create the (fiduciary) relationship.... there must be such circumstances as indicate a just foundation for a belief that in giving advice ... one is acting not in his own behalf, but in the interests of another party."

*City of Harrisburg v. Bradford Trust Co.,* 621 F.Supp. 463, 473 (M.D.Pa.1985) (citation omitted). *See also Lehner v. Crane Co.,* 448 F.Supp. 1127, 1131 (E.D.Pa.1978) (for a fiduciary relationship to exist, "one must demonstrate a relationship involving trust and confidence, and the 'proof must show confidence reposed by one side and domination and influence exercised by the other.'" (citation omitted)).

There is no showing here that the doctors accepted any fiduciary duty toward the Medicare/Medicaid Trust Funds merely by submitting bills to the funds, or that they exercised any domination and control over the trust. The government is trying to find a cause of action arising from a statutory duty, and from the use of certain language in that statute, for example, naming the funds Medicare/Medicaid *Trust* Funds.

## B. *Supreme Court Precedent on Fiduciary Duty*

An examination of the case law shows the lack of merit of the government's claim. Two Supreme Court cases concerning the relationship between the federal government and the Quinault Indian Tribe in Washington state are particularly instructive. *United States v. Mitchell (Mitchell I),* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *United States v. Mitchell (Mitchell II),* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). In these cases, the Indian tribes sued the government for an alleged breach of fiduciary duty. Like the government's claims here, the Indians asserted that the fiduciary relationship arose from a statutory duty and pointed to specific language in the statute using the word "trust." In the *Mitchell* cases, the Supreme Court explained the

circumstances under which a statutory duty could create a fiduciary duty.

The relationship between Indians and the federal government in the *Mitchell* cases parallels the relationship that the government alleges exists here between the United States and the physicians. In *Mitchell II,* the Supreme Court described:

the undisputed existence of a general trust relationship between the United States and the Indian people. This Court has previously emphasized 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.' *Seminole Nation v. United States,* 316 U.S. 286, 296 [62 S.Ct. 1049, 1054, 86 L.Ed. 1480] (1942). This principle has long dominated the Government's dealings with Indians.

*Mitchell II,* 463 U.S. at 225, 103 S.Ct. at 2972. Clearly, the Indians "repose special trust and confidence" in the United States Government because of the government's superior position to the Indians. The "special trust" that patients place in their doctors may differ in degree from the trust between the Indians and the federal government, but the Supreme Court's disposition of the *Mitchell* cases reveals why the government's fiduciary duty argument in this case must fail.

In *Mitchell I,* the Quinault Tribe sought money damages against the United States under the General Allotment Act (25 U.S.C. § 331 et seq.) for alleged mismanagement of forests on lands allotted to Indians. The General Allotment Act provides in relevant part " 'that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian for whom such allotment shall have been made.'" *Mitchell I,* 445 U.S. at 541, 100 S.Ct. at 1353 (citing 25 U.S.C. § 348).

The Court of Claims "held this language created an express trust," *id.,* just as the government here emphasizes the use of the word "Trust" in the title of the Medicare/Medicaid funds. The Supreme Court rejected the Court of Claims' reasoning, and reversed. The Supreme Court:

conclude[d] that the Act created only a limited trust relationship between the United States and the allottee that does not impose any duty.... The Act does not unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands.

*Id.* at 542, 100 S.Ct. at 1353.

Similarly, the Medicare/Medicaid statute does not unambiguously state that the doctors have assumed a fiduciary relationship towards the United States. It is undisputed that the typical doctor-patient relationship contains elements of a fiduciary relationship. *See, e.g., Calvert v. Sharp,* 748 F.2d 861, 863 (4th Cir.1984) ("[A] physician owes his ethical obligation and undivided loyalty to his patient."), *cert. denied,* 471 U.S. 1132, 105 S.Ct. 2667, 86 L.Ed.2d 283 (1985). But the Medicare/Medicaid statute does not provide that the funds and the government are included in that relationship, and that the doctors owe duties of loyalty to the funds and the government as well as to their patients. If express language stating the government would "hold the land ... in trust for the sole use and benefit of the Indian" was insufficient to create a fiduciary duty, clearly language obligating the doctor to provide proper medical services does not result in the existence of a fiduciary duty.

The circumstances in which the Supreme Court found a fiduciary relationship existed further reveal why the government's argument should not prevail here. After reversing the Court of Claims' decision based on the General Allotment Act in *Mitchell I,* the Supreme Court remanded the case for an examination of the Quinault's claims that other statutes gave rise to a fiduciary duty. After disposition of these claims by the Court of Claims, the case returned to the Supreme Court which found that the statutes and regulations governing timber management imposed a fiduciary duty on the United States Government. *United States v. Mitchell (Mitchell II),* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

In *Mitchell II,* the Supreme Court emphasized the Interior Department's "obligation to supervise the cutting of Indian timber," *Mitchell II,* 463 U.S. at 220, 103 S.Ct. at 2969, and its " 'literally daily supervision over the harvesting and management of tribal timber.' Virtually every stage of the process is under federal control." *Id.* at 222, 103 S.Ct. at 2971 (citation omitted). The Court only found a fiduciary relationship because of the government's "elaborate control over forests and property belonging to Indians." *Id.* at 225, 103 S.Ct. at 2972. Only under these circumstances did the Court apply the common law framework of identifying the trustee, the beneficiary and the trust corpus, a framework that the government attempts to impose on the facts in Kensington.

A comparison of the *Mitchell* cases to Kensington demonstrates the inappropriateness of that framework in the Kensington situation. The Supreme Court focused on questions of control over the resources, a circumstance emphasized in another case on which the government relies heavily: *United States v. Margiotta,* 688 F.2d 108, 125 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) ("the concepts of reliance, and de facto control and dominance ... are at the heart of fiduciary duty").

The doctors here had no responsibility for, or power over the Medicare/Medicaid funds. The doctors merely made claims on the funds; they could not even assure that their claims would be paid, let alone have any control over the claims of other doctors. In fact, the function of the much-discussed Peer Review Organizations is to monitor the bills presented by doctors, and to decline payment or seek reimbursement if the claim is deemed inappropriate. As the Eleventh Circuit Court of Appeals described:

This [a case brought by the government after a Peer Review Organization determined that overpayment had occurred] is not a case of the government suing a citizen for a debt. This is an action by the government seeking reimbursement of an overpayment made on an assigned claim, *with knowledge on the part of the assignee [the doctor] that any dispute*

*about amount would be reconciled by administrative hearing in the event the government questioned the necessity or reasonableness of the treatment by the physician.*

*United States v. Sanet,* 666 F.2d 1370, 1375 (11th Cir.1982) (emphasis added). Clearly, the doctors did not dominate the funds, since their bills could be reviewed through administrative hearings whose determinations the doctors could not appeal to the courts. *United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982).

Another indication that the doctors did not exercise responsibility or control over the Medicare/Medicaid funds is the daily management of the funds, a factor examined by the Supreme Court in *Mitchell II,* 463 U.S. at 222, 103 S.Ct. at 2970–71. The doctors were certainly involved in the day-to-day treatment of patients, but had nothing to do with the day-to-day affairs of the funds. The United States Government and its delegated agents fulfill these roles. Thus, under the factors delineated by the Supreme Court, the doctors do not have the power and control sufficient to find a fiduciary relationship arising from a statutory duty to the Medicare/Medicaid funds.

### C. *Other Cases*

None of the cases cited by the government helps its argument. *Hofstetter v. Fletcher,* 905 F.2d 897 (6th Cir.1988), concerned a situation where the defendant induced the beneficiary, prepared her taxes, and had control over her representation before the IRS, and her audits. *Id.* at 907. The doctors never had this amount of involvement in the activities of the Medicare/Medicaid Trust Funds.

In *FDIC v. Former Officers and Directors of Metropolitan Bank,* 884 F.2d 1304 (9th Cir.1989), *cert. denied sub nom., Lee v. FDIC,* —— U.S. ——, 110 S.Ct. 3215, 110 L.Ed.2d 662 (1990), the court only addressed the fiduciary duty claim in the context of deciding which statute of limitations was applicable to the cause of action. Moreover, from the limited facts in the opinion, the bank officers appear to be in a far different situation than the doctors. If the trust corpus is the bank's money insured by the FDIC, the bank officers had significant control over how that money was invested, a power that has no parallel to the relationship between the doctors and the Medicare/Medicaid Trust Funds.

Similarly, in *FDIC v. Paul,* 735 F.Supp. 375 (D.Utah 1990) (cited by the government during oral argument), the FDIC was appointed receiver and took possession and control of the bank's claims. The officers clearly had a fiduciary duty toward the bank, and exercised significant domination over the expenditure of the bank's assets. The FDIC's cause of action for breach of fiduciary duty arose because of its acquisition of the bank's claims, not because of its role as the bank's insurer. The government here is alleging some type of independent fiduciary duty to the Medicare/Medicaid funds, not that the funds somehow acquired a cause of action from the breach of a fiduciary duty owed to the doctor's patients. *Paul* does not support the proposition that such an independent duty exists.

All the other cases cited by the government involve federal employees. *See United States v. Boeing Co., Inc.,* 845 F.2d 476, 479 (4th Cir.1988), *rev'd on other grounds,* —— U.S. ——, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990); *United States v. Kenealy,* 646 F.2d 699 (1st Cir.), *cert. denied,* 454 U.S. 941, 102 S.Ct. 478, 70 L.Ed.2d 250 (1981); *United States v. Kearns,* 595 F.2d 729 (D.C.Cir.1978); *Continental Management, Inc. v. United States,* 527 F.2d 613, 208 Ct.Cl. 501 (1975). Federal employees are in a far different position from doctors who make Medicare/Medicaid claims. Federal employees owe a duty of loyalty to the government as their employer, and have actively assumed that duty.

A duty of loyalty does not automatically rise to the level of a fiduciary relationship. "[A]n employer-employee relationship does not, in and of itself, give rise to a fiduciary relationship." *Lehner,* 448 F.Supp. at 1131 (citations omitted). Furthermore, any fiduciary duty that does exist between a federal employee and the government arises from the nature of their relationship, rath-

er than the existence of a trust corpus and the individual's superior knowledge as trustee. *See* Everts' Renewed Motion to Dismiss at 14. Therefore, these cases have no applicability to the present case.

Finally, the government's contention that the existence of a fiduciary duty is a factual matter that should be decided by the trier of fact must be rejected. The government's reliance on *Hofstetter v. Fletcher*, 905 F.2d 897 (6th Cir.1988), for this proposition is misplaced. *Hofstetter* was applying Ohio law when it made that determination, and, as the government has emphatically argued (Plaintiff's Response at 20–23), federal common law governs this cause of action. *United States v. Pisani*, 646 F.2d 83, 86 (3d Cir.1981).

Moreover, it defies logic to suggest that all determinations of the existence of a fiduciary duty must go to the trier of fact. Under those circumstances, any plaintiff could plead vague allegations of fiduciary duty, and force the defendant to engage in needless discovery because the court could not decide the matter on a motion to dismiss or motion for summary judgment.

Accordingly, for the reasons described above, I find that, as a matter of law, Shyamalan, Ray, Everts, and Goldfeder are entitled to have Count III, the breach of fiduciary duty claims, dismissed against them. Because no fiduciary duty existed, Kensington, Hause, and Spector could not have induced the doctors to have breached any fiduciary duty. Count II will therefore be dismissed as well as Count III.

## VI. MOTIONS TO DISMISS AND FOR PARTIAL SUMMARY JUDGMENT ON COUNTS IV, V, VI, VII, VIII WILL BE DENIED

Counts IV, V, VI, VII, and VIII are against all the defendants for breaches of common law and equitable causes of action. Count IV is for common law fraud; Count V is for unjust enrichment/restitution; Count VI is for payment under mistake of fact/restitution; Count VII is for negligent misrepresentation; and Count VIII is for fraudulent misrepresentation.

Everts, Goldfeder, and Hause have moved to dismiss these counts for failure to meet the requirements of Rule 9(b) and failure to adequately plead a cause of action. *See* Everts' motion to dismiss at 37–42; Goldfeder's motion to dismiss at 7–12; K & H's motion to dismiss at 71–72. Spector, Goldfeder, Shyamalan, Ray, Escobar, Kensington, and Hause seek summary judgment on all these counts arguing that they are time-barred. *See* K & H's motion for partial summary judgment at 6–14 (incorporated by reference by Spector, Shyamalan, Ray, Escobar, and Goldfeder); Goldfeder's motion at 24–29. Defendants also request that Count V be dismissed because an unjust enrichment claim is not permitted when a contract exists. *See* K & H motion at 42–45 (incorporated by reference by Spector, Shyamalan, Ray, Escobar, and Goldfeder). The motions to dismiss for lack of specificity and failure to adequately plead a cause of action will be denied for reasons previously discussed.

### A. *Motions to Dismiss and for Partial Judgment on Statute of Limitation Grounds*

In the summary judgment motions, defendants claim that all these causes of action sound in tort and are governed by the three year statute of limitations of 28 U.S.C. § 2415(b). The government does not dispute that the three year statute of limitations of 28 U.S.C. § 2415(b) applies to Counts IV, VII, and VIII, but insists that Counts V and VI sound in contract and are subject to the six year statute of limitations of 28 U.S.C. § 2415(a). *See* Plaintiff's Response at 65–66.

Moreover, the government contends that whatever the appropriate statute of limitations was, it was tolled until at least October, 1987, and that the N & R report did not contain adequate material facts, as defendants claim. *Id.* at 66–67. If the statute was tolled, all causes of action were timely filed even if they are all subject to the three year statute of limitations because the original complaint was filed in August, 1990.

As I noted earlier, the adequacy of the contents of the N & R report appears to be

a question for the trier of fact to decide. Therefore, I cannot grant summary judgment to the defendants on these counts at this time.

### B. *Motion to Dismiss Unjust Enrichment Claims as Barred by Contract*

█ Count V for unjust enrichment has been challenged in part because of the existence of a contract between the providers and the United States. This objection would apparently only encompass claims made for fraudulent Medicare submissions because, according to counsel for all parties, only in this context did individual doctors enter into direct contractual provider agreements with the United States. The government's brief responded that the contract did not concern the allegedly fraudulent conduct, *i.e.*, the kickbacks, but only covered the Medicare payments. *See* Plaintiffs Reply at 35–36.

█ It is true that under Pennsylvania law, a contract prevents a party from making a claim of unjust enrichment; recovery is limited to the measure provided for in the contract. *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987). However, Federal rules allow pleading in the alternative. Courts have permitted plaintiffs to pursue alternative theories of recovery based both on breach of contract and unjust enrichment, even when the existence of a contract would preclude recovery under unjust enrichment. *See Marcella v. ARP Films, Inc.,* 778 F.2d 112, 117 (2d Cir.1985); *United States v. Geri–Care, Inc.,* No. 89–5220 (E.D.Pa. Feb. 1, 1990), slip op. at 6–8, 1990 WL 9463 (Hutton, J.); *Dah Chong Hong, Ltd. v. Silk Greenhouse, Inc.,* 719 F.Supp. 1072, 1074 (M.D.Fla.1989). Therefore, I will not dismiss Count V at this time. If appropriate, defendants may raise the issue later as a motion for summary judgment after discovery has been completed.

In sum, I find Counts IV–VIII meet the particularity requirements of the Federal rules. The issue of the statute of limitations is a disputed, genuine issue of material fact, and summary judgment, or dismissal, would be inappropriate on these grounds. Count V will not be dismissed because the plaintiff may plead in the alternative.

### VII. MOTIONS TO DISMISS COUNT IX, THE CLAIMS BASED ON THE ANTI–KICKBACK STATUTE, WILL BE GRANTED

Count IX charges all defendants except Everts, Parkway, and Escobar with violations of the Anti–Kickback Act of 1986, 41 U.S.C. § 51 et seq. Kensington, Hause, Shyamalan, Ray, and Goldfeder have moved for dismissal on the grounds that the Anti–Kickback Act does not apply to the type of illegal conduct alleged in the complaint. Defendants refer to the legislative history of the act, and other analogous cases for their contentions that the Act encompasses government procurement contracts, but was never intended to regulate grant programs such as Medicare/Medicaid.

The government replies that the Anti–Kickback Act was designed to include all government contracts, and that the medical service agreements fit within the definitions of the Act. The Act requires a "prime contract," which it defines as "a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment or services of any kind." 41 U.S.C. § 52(4). In this case, it is argued that the United States sought to obtain the service of medical care for its citizens.

The government asserts that in the Medicaid context, the contract between the Pennsylvania Department of Public Welfare (DPW) and the Medicaid Trust Funds constituted the "prime contract." The provider agreements between DPW and the defendants are the subcontracts. Complaint ¶ 126. In the Medicare context, the "prime contract" was the contract entered into between the Medicare Trust Fund, and its intermediary (Aetna Insurance Company) or its carrier (Pennsylvania Blue Shield). The contracts between the defendants and Aetna or Blue Shield comprise the subcontracts. Complaint ¶ 127.

To evaluate the government's Anti–Kickback Act claim, I must interpret the statute. As the Assistant United States Attorney acknowledged at oral argument, there is no case law on this issue. The Supreme Court has instructed that "[w]here, as here, resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statute is unclear." *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Thus, I begin my analysis by examining the statute.

The government correctly notes that nothing in the Anti–Kickback Act explicitly precludes it from applying to grant programs such as Medicare/Medicaid. The pivotal question is whether the relationships between DPW and Medicaid and between the intermediary/carrier and Medicare constitute contracts. I will discuss these two relationships separately because the alleged "prime contracts" are different.

A. *The Medicaid–DPW Relationship*

■ In addressing alleged kickbacks under Medicaid, the government argues that the Pennsylvania state plan submitted to the federal government is the "prime contract." The government emphasizes language in a Supreme Court case which stated that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981) (interpreting Developmentally Disabled Assistance and Bill of Rights Act). That language was cited in a later case concerning Title I. *Bennett v. New Jersey,* 470 U.S., 632, 638, 105 S.Ct. 1555, 1559, 84 L.Ed.2d 572 (1985). According to the government, this language shows that relationships between states and the federal government under federal grant programs are contractual.

Inquiry cannot end with the examination of a few phrases from a Supreme Court opinion. As other Supreme Court opinions, and decisions by Courts of Appeals reveal, the weight of authority does not support the government's position. While no one denies that grant programs have certain contractual aspects, they differ significantly from traditional contracts, and classic contractual analysis is typically not applied to the federal-state relationships arising under grant programs.

The Supreme Court decided *Bennett v. Kentucky,* 470 U.S. 656, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985), on the same day it ruled on *Bennett v. New Jersey,* which was cited by the government. The Supreme Court further explained the contractual aspects of grant programs in its *Kentucky* opinion:

> Although we agree with the State that Title I grant agreements had a contractual aspect, see *Bennett v. New Jersey, ante,* at 638 [105 S.Ct. at 1559,] the program cannot be viewed in the same manner as a bilateral contract governing a discrete transaction. Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.

*Kentucky,* 470 U.S. at 669, 105 S.Ct. at 1552 (citation omitted). The Supreme Court also noted that the "ongoing, cooperative" nature of the programs distinguished federal/state grants from contracts. *Id.*

Most recently, while finding hospitals had a substantive right to reasonable and adequate reimbursement under Medicaid, the Supreme Court described Medicaid as "a cooperative federal-state program," *not* as a contractual arrangement. *Wilder v. Virginia Hosp. Ass'n,* —— U.S. ——, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990). This quote is particularly significant given that, in *Wilder,* the Supreme Court was analyzing rights allegedly created under the Medicaid program. Under these circumstances, if the Supreme Court had felt that Medicaid created contractual relationships, it would probably have so noted, but instead it chose to term Medicaid "a cooperative federal-state program." *Id.*

Courts of Appeals have consistently found that grant programs are not contracts. In *Maryland Dep't of Human Resources v. Department of Health and Human Servs.*, 763 F.2d 1441 (D.C.Cir.1985), the District of Columbia Circuit Court of Appeals held that the relationship between the United States and the State of Maryland arising from grant monies awarded to Maryland pursuant to Title XX of the Social Security Act was not a contract. The Court of Appeals acknowledged that "the principles of contract law undoubtedly have a role to play in such disputes [disputes arising from grant programs]." *Id.* at 1449. The relationship has elements very different from a traditional contract: disputes under grant programs "turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties." *Id.* Consequently, the Court of Appeals found "Maryland's claims are not contract claims." *Id.*

The Seventh Circuit Court of Appeals faced a similar question in *American Hosp. Ass'n v. Schweiker*, 721 F.2d 170 (7th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984). In that case, the hospitals sued to have regulations under the Hill–Burton Act declared invalid. The Hill–Burton Act shares many parallels with the Medicaid program. Like Medicaid, the Hill–Burton Act seeks to provide adequate health care for the disadvantaged. Medicaid compensates doctors; the Hill–Burton Act addresses the need for facilities and gives states grants and loans to construct hospitals and other medical facilities. Like Medicaid, states seeking funds under the Hill–Burton Act must submit a state plan which complies with federal regulations. The states receive the federal monies, and then distribute the funds to approved projects. *See id.* at 172–74 (description of Hill–Burton Act). In sum, for all relevant purposes in evaluating the government's claim under the Anti–Kickback Act, the Hill–Burton Act closely parallels Medicaid.

Consequently, the reasoning of the Seventh Circuit Court of Appeals in rejecting the hospitals claims regarding the existence of a contract is particularly persuasive, and I shall quote it at length:

> [T]he relationship between the government and the hospitals here cannot be wholly captured by the term "contract" and the analysis traditionally associated with that term. Rather than a voluntary agreement negotiated between two parties, a grant-in-aid program like that under the Hill–Burton Act is an exercise by the federal government of its authority under the spending power to bring about certain public policy goals. The government acts by inducing a state or private party to cooperate with the federal policy by conditioning receipt of federal aid upon compliance by the recipient with federal statutory and administrative directives. The "conditions" of this arrangement are not the result of a negotiated agreement between the parties but rather are provided by the statute under which the program is administered. Determination of statutory intent, therefore, is of more relevance to the interpretation of these conditions than is an inquiry into the intent of the two parties at the moment of initial agreement. *The contract analogy thus has only limited application.*

*Id.* at 182–83 (citation omitted) (emphasis added). As the Court of Appeals opinion makes clear, analogizing grant programs to traditional contracts would thwart, rather than effectuate, Congressional intent.

The state Medicaid plan does not constitute the "prime contract" required by the Anti–Kickback Act because the relationship between the federal and state governments, while containing contractual aspects, is not truly a contract. Lacking a "prime contract," no liability can arise on the part of Kensington or the doctors under the Anti–Kickback Act, and Count IX will be dismissed insofar as it concerns Medicaid. As my later discussion of the legislative history of the Anti–Kickback Act reveals, this result furthers the Congressional intent in adopting the 1986 amendments to the Anti–Kickback Act. Thus, my decision is consistent with both

the statutory language and the legislative history.

### B. *The Medicare–Intermediary/ Carrier Relationship*

 The original complaint did not charge the doctors or hospital with Anti–Kickback liability based on their Medicare submissions. The Assistant United States Attorney explained that this omission was the result of an oversight, but I believe that the problem runs deeper than that. Simply put, while the Medicaid program resulted in an arrangement that could arguably be described as a "prime contract," there is no such analogy in Medicare because doctors, if they contract at all, contract directly with the government for Medicare services. The Medicare program has no subcontractors.

The government characterizes the relationship between the Medicare funds and its intermediary (Aetna Insurance Company) or its carrier (Pennsylvania Blue Shield) as the prime contract. *See* Complaint at ¶ 127. That paragraph of the complaint and portions of the government's reply brief acknowledge, however, that the intermediaries and carrier are not independent actors, but merely agents of the government. *Id. See also* Plaintiff's Reply at 7 (citing *Fox v. Bowen,* 656 F.Supp. 1236, 1238 (D.Conn.1987).[8] Any contract between the intermediaries/carriers and the doctors exists for the benefit of the government, not the benefit of the intermediaries/carriers. These relationships do not create the prime contractor/subcontractor relationships required for the Anti–Kickback Act to apply.

In truth, the government has two separate contractual relationships: one with the intermediaries/carriers which the government itself describes as a contract "to administer Part B benefits to qualified individuals, and to set provider payment rates, receive requests for, disburse and audit payments, as well as determine compliance with utilization review requirements." *See*

Plaintiff's Reply at 7. This contract obviously concerns administrative, processing and monitoring requirements.

The government's other contract is with the doctors who have entered into an agreement to provide medical services to the elderly and disabled. In no way can the contract with the doctors be construed as a subcontract of the contract with the carriers/intermediaries as required for the Anti–Kickback Act to apply. The Anti–Kickback Act defines "subcontract" as "a contract or contractual action entered into by a prime contractor or subcontractor for the purpose of obtaining supplies, materials, equipment or services of any kind under a prime contract." 41 U.S.C. § 52(7). If the carriers/intermediaries had entered into subcontracts with other companies to process or monitor claims, these arrangements would constitute subcontracts for the purposes of the Anti–Kickback Act. But this is not the case. The carriers were administering other contracts, directly entered into between the government and the doctors. Thus, the requisite prime contract/subcontract does not exist in the Medicare context.

 An examination of the term "kickback" reveals another flaw with the government's attempt to make the Anti–Kickback Act apply here. Kickbacks denote a payment to a party higher up in the relationship with the government in return for favorable treatment. The Anti–Kickback Act defines a kickback as anything

> which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or sub-contractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

41 U.S.C. § 52(2).

Under this definition, for liability to attach, the doctors would have to have been making kickbacks to the intermediar-

---

**8.** Another example of the close relationship between the government and the carriers is that courts have held the statute of limitations for *governmental* causes of action for overpayment

under Medicare runs from the date the Peer Review Organization notifies the *carrier* of the overpayment. *United States v. Diaz,* 790 F.2d 866 (11th Cir.1986).

ies/carriers in return for favorable treatment. But, the government does not allege that this type of conduct occurred. In Medicare, all the doctors and the hospital had their own independent relationships with the government; none of these relationships could be construed as a subcontract of any other party. The failure to satisfy the Anti–Kickback Act's definition of "kickback" and "subcontract" is yet another indication of the inapplicability of the Act to this conduct.

Accepting the government's allegations as true, the behavior of the doctors and Kensington may have been morally and criminally wrong, and violative of numerous statutes and ethical codes. Whatever money changed hands under the Medicare program, however, cannot be characterized as "kickbacks" between subcontractors, or between subcontractors and a prime contractor, under the Anti–Kickback Act, 42 U.S.C. § 51 et seq. The doctors and the hospital may have broken many laws by their conduct under the Medicare program, but, by its own terms, the Anti–Kickback Act is not one of them.

### C. *Legislative History of the Anti–Kickback Act*

I will conclude with an examination of the legislative history of the Anti–Kickback Act which only bolsters my conclusion that the Act does not apply to this type of conduct. The Congressional intent revealed from the legislative history provides an independent basis for my ruling that the doctors and hospital are not liable under the Anti–Kickback Act.

In 1986, Congress amended the Anti–Kickback Act to "close loopholes in and broaden the coverage of the Anti–Kickback Act, 41 U.S.C. 51–54, in order to deter kickbacks relating to subcontracts under Federal Government contracts." S.Rep. No. 99–435, 99th Cong., 2d Sess. 2 (1986) (hereafter S.Rep.).

The description of the problem Congress was addressing through the amendments makes it clear that the Anti–Kickback Act was not intended to cover grant programs. The only examples of prohibited kickbacks included in the Senate and House Report are examples of kickbacks in the defense industry. *Id.* at 4–7; H.Rep. No. 99–964, 99th Cong., 2d Sess. 5–7 (1986) (hereafter H.Rep.). While nothing in the Act limits it to the defense industry, the legislative reports indicate numerous times that Congress was concerned with corruption in "the federal procurement system." S.Rep. at 2, 3, 10; H.Rep. at 4, 5.

In their discussion of the term "kickback," both the Senate and the House state that it covers improper behavior connected with the federal procurement process. *See* S.Rep. at 10 ("the definition clarifies the prohibition against transactions to obtain preferential treatment in the federal procurement process"); H.Rep. at 11 ("This portion is intended to expand the coverage of the existing Act to kickbacks made in the Federal procurement process for any improper purpose."). This language and the type of examples used show that Congress by the amendments addressed procurement contracts, not grant programs. The Medicare and Medicaid programs do not resemble federal procurement contracts. Although the government attempts to provide medical and health benefits to segments of the public, the government does not "procure" such services for itself or anyone else.

The government insists that by using the unmodified term "contract" Congress sought to regulate any type of contractual arrangement, not just procurement. As the legislative history states, Congress only expanded the definition of contracts in the amendments because officials complained that the original definition was too restrictive. Formerly, the Act only covered "negotiated" contracts, but corruption pervaded non-negotiated contracts, such as sealed bids or fixed-price contracts as well. The use of the term "negotiated" had provided wrongdoers with a technical loophole that Congress closed by amending the Act to apply to all federal contracts. S.Rep. at 8; H.Rep. at 9. Nowhere in the legislative history does Congress suggest that by amending this term, it meant the Act to apply to more than federal procurement contracts. Certainly, nothing in the legisla-

tive history supports the government's contention that the amendment expanded the meaning of "contract" so far that it now includes grant programs. It is unlikely that Congress would make such a dramatic change without a word of discussion. Clearly, Congress never intended the Anti–Kickback Act to apply to the Medicare and Medicaid programs.

Congress' explanation of the definitions used in the Anti–Kickback Act further reveals that the Act does not encompass Medicare/Medicaid grant programs. The patterns of behavior that the reports discuss do not begin to resemble the alleged wrongdoing in this case. The Senate report states that "kickbacks" include payments between subcontractors and prime contractors, higher and lower tier subcontractors, suppliers to prime contractors or subcontractors, and sales representatives. S.Rep. at 12. The Senate elaborated: "In a typical case, the United States awards a prime contract to a particular company which decides to subcontract part or all of the work to others. One or more of the potential subcontractors, to obtain favorable treatment in the subcontracting process, offers or provides kickbacks to key personnel." *Id.* at 2.

These situations are completely different from the type of relationships that exist in the Medicare/Medicaid context. None of the alleged kickbacks occurred between subcontractors and a prime contractor, or between higher or lower tier subcontractors, or suppliers or sales representatives. To stretch the definition of "kickback" to cover the alleged payments here would be to distort it beyond anything Congress considered in enacting the law.

Because both the language of the statute and the legislative history reveal that Congress never intended the Anti–Kickback Act to apply to the wrongdoing alleged in the complaint, I will grant Kensington's, Hause's, Shyamalan's, Ray's, and Goldfeder's motions to dismiss Count IX.

## VIII. THE PARTIES SHALL SETTLE THE MOTION FOR PROTECTIVE RELIEF

As previously noted, Kensington and Hause have requested protective relief concerning the N & R Report. When questioned at oral argument, their counsel indicated that the report contained embarrassing allegations about individuals not parties to this case. I directed the parties to work out a protective order among themselves. I informed counsel that any party to this litigation had a right to see the report to the extent it could be helpful, but that the report was only to be used for the purposes of this litigation, not disseminated to the public generally.

I also directed the parties to prepare a proposed schedule for discovery with time frames for paper discovery, depositions of fact witnesses, depositions of experts (if needed), and filing dispositive motions. I will order the parties to prepare a proposed protective order and discovery schedule to be submitted to the court.

## IX. CONCLUSION

I will deny Goldfeder's motion for more definite statement pursuant to Rule 12(e) and deny his motion to dismiss pursuant to Rule 9(b). I will deny Hause's motion to dismiss Counts I, IV, and VIII pursuant to Rule 9(b), and Everts' motion to dismiss Counts I and IV pursuant to Rule 9(e). I will deny Spector's and Goldfeder's motions to dismiss Count I for failure to state a claim pursuant to Rule 12(b)(6). I will deny Shyamalan's, Ray's, Escobar's and Goldfeder's motions for partial summary judgment on Counts I, IV, V, VI, VII, and VIII. I will deny Spector's motion to dismiss on statute of limitations grounds. I will deny Kensington's, Hause's, Shyamalan's, Ray's, Escobar's, Spector's and Goldfeder's motions to limit discovery. I will deny Kensington's, Hause's, Spector's, Shyamalan's, Ray's, Escobar's and Goldfeder's motions to dismiss Count V in part.

I will grant Kensington's, Hause's and Spector's motions to dismiss Count II. I will grant Shyamalan's, Ray's, Everts' and Goldfeder's motions to dismiss Count III. I will grant Kensington's, Hause's, Shyamalan's, Ray's, Spector's and Goldfeder's motions to dismiss Count IX.

The parties shall submit a proposed protective order disposing of the motion for protective relief, and a proposed discovery time-table schedule. If unable to agree as to either, the parties shall file separate proposals, and with such submissions expressly delineate the areas of disagreement.